# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| **BILLY JOE WINROW,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )     **Case No. CIV-13-1144-D** |
| | ) |
| **SID STELL et al.,** | ) |
| | ) |
| **Defendants.** | ) |

## REPORT AND RECOMMENDATION

Plaintiff Billy Joe Winrow, a state prisoner appearing pro se and proceeding *in forma pauperis*, brings this action under 42 U.S.C. § 1983, alleging violations of his federal constitutional rights. United States District Judge Timothy D. DeGiusti has referred the matter to the undersigned Magistrate Judge for initial proceedings consistent with 28 U.S.C. § 636(b). This matter is now before the Court on a dispositive motion filed by Defendants Sid Stell, B.R. Thompson, Natalie Powell, Cody Hisaw, and Josie Solis (Doc. No. 41).

## BACKGROUND

Mr. Winrow, who is incarcerated at the Dick Conner Correctional Center in Hominy, Oklahoma, commenced this action on October 28, 2013, by filing a Complaint (Compl., Doc. No. 1), along with Exhibits (Doc. No. 1-1, "Compl. Exs.") and an Affidavit (Doc. No. 2, "Compl. Aff."). In his Complaint, Mr. Winrow names six

Defendants in their official and individual capacities. *See* Compl. at 1-2.[1] One Defendant, Justin Jones, who formerly was the Director of the Oklahoma Department of Corrections ("ODOC"), has been dismissed from this matter. *See id.* at 2; Order, Doc. No. 58 (granting Defendant Jones' Motion to Dismiss).[2] The five remaining Defendants are current or former employees of the Pottawatomie County Public Safety Center ("PCPSC") in Shawnee, Oklahoma: Sid Stell, the Executive Director; B.R. Thompson, the Assistant Executive Director; Natalie Powell, a Detention Officer; Cody Hisaw, a Detention Officer; and Josie Solis, the Medical Services Supervisor (collectively, the "PCPSC Defendants" or "Defendants"). *See* Compl. at 1, 4-8; PCPSC Defs.' Notice of Party Name Corrections, Doc. No. 22; Defs.' Disp. Mot., Doc. No. 41, at 8-9.[3]

Mr. Winrow's allegations stem from events that occurred in August 2013, while he was temporarily incarcerated at the PCPSC for approximately three weeks in order to

---

[1] Citations to documents filed with the Court use the page numbers assigned by the Court's electronic filing system. When quoting from the Complaint and other handwritten filings, the undersigned has occasionally altered the capitalization to improve readability.

[2] This dismissal applied to Robert Patton, who became ODOC Director on January 17, 2014, and succeeded Defendant Jones as a defendant in this suit on all official-capacity claims against Defendant Jones. *See* Report & Recommendation, Doc. No. 57, at 1-2 n.2; Order, Doc. No. 58.

[3] In his Complaint, Mr. Winrow spells the surname of Defendant Hisaw as "Highsaw." *See* Compl. at 1, 7; PCPSC Defs.' Notice of Party Name Corrections. Mr. Winrow also identifies Defendant Solis as "J. Josie." *See* Compl. at 1, 8; PCPSC Defs.' Notice of Party Name Corrections. The corrected names are used in this Report and Recommendation.

facilitate his appearance in state court proceedings in Pottawatomie County.[4] *See* Compl.; Compl. Aff. at 1 (stating Mr. Winrow "was by court ordered writ, taken to the [PCPSC] to attend court ordered evidentiary hearing, in the Pottawatomie County District Court"). As discussed in detail below, Mr. Winrow's claims relate to alleged injuries sustained by him, and alleged unsanitary conditions experienced by him, "in [ODOC] housing Pod-A" at the PCPSC. Compl. at 2. Mr. Winrow contends that Defendants violated his Fourteenth Amendment rights to due process and to equal protection, as well as his Eighth Amendment right to be free from cruel and unusual punishment. *Id*. at 3. Mr. Winrow also contends that Defendants violated other unspecified federal and state laws. *See id.* at 4-8.

The parties were free to conduct discovery in this matter until April 8, 2014, when discovery was largely stayed following discovery disputes that arose before Defendants filed a responsive pleading or dispositive motion. *See* Order, Doc. No. 35, at 11. Neither party has moved for the stay to be lifted.

PCPSC Defendants have now moved to dismiss, or, alternatively, for summary judgment (Defs.' Disp. Mot., Doc. No. 41) and have filed exhibits in support of their

---

[4] In 1998, Mr. Winrow was convicted by a jury of robbery with a firearm and began serving a 102-year sentence. *See State v. Winrow*, No. CF-1997-403 (Pottawatomie Cnty. Dist. Ct. filed Sept. 25, 1997). Thus, at the time of the events relevant to this civil action, he was a convicted prisoner rather than a pretrial detainee. The publicly available docket sheet in Mr. Winrow's state criminal proceeding reflects that he appeared in Pottawatomie County District Court on August 14, 2013, for a hearing regarding his application for postconviction relief. *See Case Information*, Okla. State Cts. Network, http://www.oscn.net/dockets/GetCaseInformation.aspx?db=pottawatomie&cmid=7090 (last visited Mar. 4, 2015).

motion (Doc. Nos. 41-1 to 41-16). Mr. Winrow has responded to the dispositive motion (Pl.'s Resp., Doc. No. 43) and has filed additional evidentiary material in support of his claims (Doc. Nos. 43-1, 43-2, 43-3, 43-4).[5] PCPSC Defendants filed a reply (Defs.' Reply, Doc. No. 50), along with an additional exhibit (Doc. No. 50-1). Finally, Mr. Winrow submitted a supplemental brief (Pl.'s Supp. Br., Doc. No. 54) and exhibits (Doc. No. 54-1), without obtaining leave of Court, but which the undersigned has accepted and considered in reaching a recommendation on PCPSC Defendants' dispositive motion. *See* LCvR 7.1(i).

## ANALYSIS

Although Mr. Winrow's Complaint is organized into three counts, the factual allegations and legal claims set forth within often overlap among these counts. Accordingly, the undersigned has primarily considered Mr. Winrow's pleading through reference to his legal claims, rather than adhering to the pleading's format.

In their collective motion, PCPSC Defendants broadly assert—with little attention to or effort to distinguish between the varying standards of review—that Mr. Winrow has failed to state a claim upon which relief may be granted, that alternatively summary judgment should be entered in their favor, and that as government employees they are entitled to qualified immunity in their individual capacities. *See* Defs.' Disp. Mot. at 7, 20-36. Because Defendants present factual allegations, sworn statements, and evidence

---

[5] The remainder of the exhibits filed with Mr. Winrow's Response (i.e., Doc. Nos. 43-5, 43-6, 43-7) are duplicates of exhibits that Mr. Winrow filed with his Complaint (i.e., Doc. No. 1-1, at 11-12, 17, 22).

beyond the pleadings, the undersigned construes Defendants' motion strictly as one for summary judgment. *See* Fed. R. Civ. P. 12(d); *cf. Marquez v. Cable One, Inc.*, 463 F.3d 1118, 1121 (10th Cir. 2006) (holding that the court was not required to give notice of converting a Rule 12(b)(6) motion to a Rule 56 motion when the motion was styled in the alternative and included evidence outside the pleading and plaintiff's response clearly showed he was aware of the request for summary judgment); *Hall v. Bellmon*, 935 F.2d 1106, 1110-11 (10th Cir. 1991) ("A motion for summary judgment that is supported by affidavits or other materials provided under oath gives the adverse party notice that summary judgment is possible[.]"). Thus, when considering the arguments in Defendants' motion, the undersigned has considered matters beyond the pleadings presented by both Defendants and Mr. Winrow. As to any claims addressed herein but beyond the scope of Defendants' dispositive arguments, the undersigned has not considered matters presented beyond the pleadings.

A. *Standards of Review*

1. Motion for Summary Judgment

Summary judgment is a means of testing in advance of trial whether the available evidence would permit a reasonable jury to find in favor of the party asserting a claim. After considering the evidence and the inferences drawn from the record in the light most favorable to the nonmoving party, the court is required to grant summary judgment when "'there is no genuine [dispute] as to any material fact and the movant is entitled to judgment as a matter of law.'" *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (quoting

Fed. R. Civ. P. 56(a)).  Parties may establish the existence or nonexistence of a material disputed fact through:

- citation to "depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" in the record; or

- demonstration "that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."

Fed. R. Civ. P. 56(c)(1)(A)-(B).  Unsubstantiated allegations and inferences based on mere speculation or conjecture, however, are insufficient to establish the existence of a disputed material fact.  *Self v. Crum*, 439 F.3d 1227, 1230, 1235-36 (10th Cir. 2006).

The court does not "weigh the evidence and determine the truth of the matter" but instead "determine[s] whether there is a genuine issue for trial"—i.e., whether "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).  The party moving for summary judgment bears the burden of showing that the undisputed material facts require judgment as a matter of law in that party's favor.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  Finally, under Local Civil Rule 56.1(b), the movant's brief must contain "a concise statement of material facts" that the movant contends are not genuinely disputed.  If any such fact is not "specifically controverted" by the nonmoving party, that fact "*may* be deemed admitted for the purpose of summary judgment."  LCvR 56.1(c) (emphasis added).

## 2. Independent Obligation to Screen Plaintiff's Complaint

In addition to considering the contentions set forth in Defendants' dispositive motion, the Court is also required to evaluate the sufficiency of any complaint brought by a prisoner (1) with respect to prison conditions; (2) seeking redress against a governmental entity, officer, or employee; or (3) who is proceeding *in forma pauperis*. *See* 42 U.S.C. § 1997e(c)(1); 28 U.S.C. §§ 1915A(a), 1915(e)(2)(B). The Court is required to dismiss a complaint or any portion of a complaint that fails to state a claim upon which relief may be granted.[6] *See* 42 U.S.C. § 1997e(c)(1); 28 U.S.C. §§ 1915(e)(2)(B)(ii), 1915A(b)(1). The standard of review for such screening is the same as that applied when considering a motion to dismiss for failure to state a claim upon which relief may be granted, which is detailed below. *See Kay v. Bemis*, 500 F.3d 1214, 1217-18 (10th Cir. 2007).

Although the Court construes a pro se litigant's pleadings liberally, no litigant is exempt from compliance with or the consequences of applicable procedural rules. *See id.* at 1218. Such rules require a plaintiff's complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The complaint must include "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A complaint fails to state such a claim when it lacks factual allegations sufficient "to raise a right to relief above

---

[6] The Court is also required to dismiss a complaint or any portion of a complaint that is frivolous or malicious or that seeks monetary relief from a defendant who is immune from such relief. *See* 42 U.S.C. § 1997e(c)(1); 28 U.S.C. §§ 1915(e)(2)(B), 1915A(b).

the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* at 555 (footnote and citation omitted). Bare legal conclusions in a complaint, however, are not assumed to be true; legal conclusions "must be supported by factual allegations" to state a claim upon which relief may be granted. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

"[A] pro se plaintiff requires no special legal training to recount the facts surrounding his alleged injury, and he must provide such facts if the court is to determine whether he makes out a claim on which relief can be granted." *Hall*, 935 F.2d at 1110; *see also Whitney v. New Mexico*, 113 F.3d 1170, 1173-74 (10th Cir. 1997) (noting that although courts construe pro se pleadings liberally, courts "will not supply additional factual allegations to round out a plaintiff's complaint"). Whether a complaint contains sufficient facts to avoid dismissal is context-specific and is determined through a court's application of "judicial experience and common sense." *Iqbal*, 556 U.S. at 679; *see also Gee v. Pacheco*, 627 F.3d 1178, 1184-85 (10th Cir. 2010) (discussing *Iqbal*).

### B. Substantive Requirements for Claims Under 42 U.S.C. § 1983

To succeed on a claim under 42 U.S.C. § 1983, a plaintiff must show *both*: (1) a violation of a right secured by the Constitution or laws of the United States, and (2) that the violation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988). It is not sufficient to establish only that a federal right was violated.

1. <u>Official Capacity Claims Under § 1983</u>

If a defendant is sued under § 1983 in his or her official capacity, the suit is generally treated as one against the governmental entity that the defendant represents. *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985). Here, the relevant entity is a county, thereby implicating municipal liability. To establish municipal liability under § 1983, a plaintiff must first identify an official policy or custom of the municipality, whether enacted or maintained by its legislative body or an authorized decisionmaker. *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 769-70 (10th Cir. 2013). "A challenged practice may be deemed an official policy or custom for § 1983 municipal-liability purposes if it is a formally promulgated policy, a well-settled custom or practice, a final decision by a municipal policymaker, or deliberately indifferent training or supervision." *Id.* at 770.

After identifying such an official policy or custom, the plaintiff must then establish that the policy or custom either (1) directly violated a federal right of the plaintiff, or (2) was the "moving force" behind a county employee's violation of a federal right of the plaintiff.[7] *Id.* Finally, a plaintiff must "show that the policy was enacted or maintained with deliberate indifference to an almost inevitable constitutional injury." *Id.* at 769, 770-71. Thus, for each claim of municipal liability, the plaintiff must establish

---

[7] Because a municipality cannot be vicariously liable under § 1983 for the acts of an employee, "rigorous standards of culpability and causation must be applied" when "a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so." *Bd. of Cnty. Comm'rs of Bryan Cnty., Okla., v. Brown*, 520 U.S. 397, 405 (1997).

three elements: (1) official policy or custom, (2) causation, and (3) requisite state of mind. *Id.* at 769.

## 2. Individual Capacity Claims Under § 1983

When a defendant is sued in his or her individual capacity under § 1983, the plaintiff must establish specific elements as to each defendant. First, the plaintiff must establish the defendant's "personal involvement or participation" in the alleged violation of a federal right. *Grimsley v. MacKay*, 93 F.3d 676, 679 (10th Cir. 1996); *see also Bennett v. Passic*, 545 F.2d 1260, 1262-63 (10th Cir. 1976). Second, the plaintiff must establish a causal connection between the acts of that particular defendant and the alleged violation of a federal right. *See Iqbal*, 556 U.S. at 676; *Pahls v. Thomas*, 718 F.3d 1210, 1225-28 (10th Cir. 2013). Finally, the plaintiff must establish that the defendant acted with the state of mind required for the alleged underlying federal rights violation. *See Daniels v. Williams*, 474 U.S. 327, 330 (1986).

The above requirements also apply when a supervisor is alleged to be responsible for the misconduct of a subordinate. *See Schneider*, 717 F.3d at 767 (holding that § 1983 claim against supervisor cannot be premised on vicarious liability); *Iqbal*, 556 U.S. at 676-77; *see also Dodds v. Richardson*, 614 F.3d 1185, 1199 n.8 (10th Cir. 2010) (noting that elements of liability may overlap). To establish the supervisor's personal involvement, a plaintiff must show that the supervisor's own individual actions violated a federal right of the plaintiff, for example through the supervisor's specific direction of a subordinate employee's action or through the supervisor's promulgation, creation, implementation, or responsibility for the continuation of a policy that resulted in the

violation. *See Iqbal*, 556 U.S. at 676-77; *Schneider*, 717 F.3d at 767-68; *Pahls*, 718 F.3d at 1225, 1226 (requiring plaintiff to "identify the specific polic[y] over which [a] particular defendant[] possessed responsibility and that led to the alleged constitutional violation"); *Dodds*, 614 F.3d at 1194, 1199. In this regard, it is not sufficient "merely to show [the] defendant was in charge of other state actors who actually committed the violation." *Dodds*, 614 F.3d at 1195 (internal quotation marks omitted). To establish causation—i.e., that a supervisor caused a violation of the plaintiff's federal rights—the plaintiff must establish that a subordinate of the defendant-supervisor violated the plaintiff's federal rights and that "the defendant set in motion a series of events that the defendant knew or reasonably should have known would cause" such a violation. *See Schneider*, 717 F.3d at 768 (internal quotation marks omitted); *see also Dodds*, 614 F.3d at 1195-96, 1198. Finally, to establish state of mind the plaintiff must show that the supervisor acted with certain requisite intent, the exact nature of which depends on the type of violation alleged but is no less than the state of mind required for the subordinate to commit the underlying violation. *See Schneider*, 717 F.3d at 769; *Daniels*, 474 U.S. at 330; *Porro v. Barnes*, 624 F.3d 1322, 1328 (10th Cir. 2010); *Estate of Booker v. Gomez*, 745 F.3d 405, 435 (10th Cir. 2014).

### 3. Qualified Immunity from Individual-Capacity Claims

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818

(1982)). This doctrine is intended "to shield officials from harassment, distraction, and liability when they perform their duties reasonably," while ensuring that such officials who "exercise power irresponsibly" are held accountable. *Id.*

When qualified immunity is asserted in the context of a motion for summary judgment, evidence beyond the allegations in the complaint is considered, and the standard detailed above for summary judgment is applied. *See Iqbal*, 556 U.S. at 673-74. The court analyzes a defendant's entitlement to qualified immunity through a two-pronged inquiry in which either prong may be considered first. *See Tolan*, 134 S. Ct. at 1866; *Pearson*, 555 U.S. at 236. To overcome this defense, the plaintiff bears the burden of establishing that the defendant violated the plaintiff's clearly established federal right. *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1312 (10th Cir. 2002). In this regard, the Court considers (1) "whether the facts that a plaintiff has . . . shown make out a violation of a constitutional right"; and (2) "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Pearson*, 555 U.S. at 232 (citation omitted).

4. Claims Under § 1983 for Violation of Eighth Amendment Rights

As its prohibition against cruel and unusual punishment is interpreted, the Eighth Amendment imposes duties on prison officials to "provide humane conditions of confinement . . . [by] ensur[ing] that inmates receive adequate food, clothing, shelter, and medical care" and "tak[ing] reasonable measures to guarantee the safety of the inmates." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (internal quotation marks omitted); *see also Rhodes v. Chapman*, 452 U.S. 337, 344-45 (1981) (noting applicability of Eighth Amendment to states through Fourteenth Amendment). Comfortable prisons, however,

are not mandated by the Constitution; conditions may be harsh. *Farmer*, 511 U.S. at 832-33; *Rhodes*, 452 U.S. at 347, 349. To establish an Eighth Amendment violation based on a condition of confinement, a prisoner must establish an objective component and a subjective component, as detailed below.

a. Claim of Deliberate Indifference to Inmate's Health and Safety

As to the objective component for a claim of deliberate indifference to inmate health and safety, the plaintiff must establish that the condition was "'sufficiently serious' to implicate constitutional rights"—one that objectively "'pos[ed] a substantial risk of serious harm' to inmate health or safety." *DeSpain v. Uphoff*, 264 F.3d 965, 971, 973 (10th Cir. 2001) (quoting *Farmer*, 511 U.S. at 834). As to the subjective component, the plaintiff must establish that the defendant exhibited deliberate indifference to this risk, i.e., that the defendant knew of and disregarded the "excessive risk to inmate health or safety." *See Farmer*, 511 U.S. at 834-37; *see also DeSpain*, 264 F.3d at 971-72.

Further, in determining whether a challenged condition is sufficiently serious, a court considers the "particular facts of each situation." *DeSpain*, 264 F.3d at 974. The court must balance the "'broad and idealistic concepts of dignity, civilized standards, humanity and decency' embodied in the Eighth Amendment" against "judicial respect for the exigencies of running a prison." *Id.* at 973 (quoting *Estelle v. Gamble*, 429 U.S. 97, 102 (1976)). An Eighth Amendment "analysis should not be based on 'a court's idea of how best to operate a detention facility.'" *Id.*(quoting *Rhodes*, 425 U.S. at 351)).

b.  Claim of Deliberate Indifference to Inmate's Serious Medical Need

Through the Eighth Amendment's prohibition against cruel and unusual punishment, prisoners are protected against the "unnecessary and wanton infliction of pain," which includes "deliberate indifference to [their] serious medical needs." *Estelle*, 429 U.S. at 104 (internal quotation marks omitted).  To meet the objective component of a claim of deliberate indifference to a serious medical need, a plaintiff must establish that the deprivation of rights is related to a serious medical need, i.e., "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000) (internal quotation marks omitted).  For this analysis, the relevant question is "whether the alleged harm . . . is sufficiently serious," not "whether the symptoms displayed to the prison employee are sufficiently serious." *Mata v. Saiz*, 427 F.3d 745, 753 (10th Cir. 2005).  When the harm is alleged to have resulted from a delay in medical care, the harm must be "substantial," such as that resulting in a permanent disability or in substantial pain, including such injury or pain incurred while awaiting treatment. *Al-Turki v. Robinson*, 762 F.3d 1188, 1193 (10th Cir. 2014); *see also Sealock*, 218 F.3d at 1210 ("[N]ot every twinge of pain suffered as the result of delay in medical care is actionable."); *Mata*, 427 F.3d at 753 (reiterating requirement for "significant, as opposed to trivial, suffering").

To meet the subjective component of a claim of deliberate indifference to a serious medical need, a plaintiff must establish that the defendant "acted or failed to act despite his [or her] knowledge of a substantial risk of serious harm." *Farmer*, 511 U.S. at 842.

The defendant's knowledge is a question of fact and may be established, among other ways, through inference from circumstantial evidence or "from the very fact that the risk was obvious." *Id.* Only the symptoms that were presented to the prison employee are considered—i.e., whether "the symptoms [were] such that a prison employee knew the risk to the prisoner and chose (recklessly) to disregard it." *Mata*, 427 F.3d at 753; *see also Martinez v. Beggs*, 563 F.3d 1082, 1089-90 (10th Cir. 2009) (noting that defendant must have disregarded substantial risk of specific type of harm claimed by plaintiff). Denying or delaying a prisoner's access to medical professionals capable of assessing or treating the prisoner's condition can establish the subjective component, particularly when unnecessary pain or a worsened condition results. *See Self*, 439 F.3d at 1231 (citing *Sealock*, 218 F.3d at 1211); *Mata*, 427 F.3d at 755; *Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980).

5. Claims Under § 1983 for Violation of Fourteenth Amendment Rights

Mr. Winrow's Complaint alleges violations of his Fourteenth Amendment rights to due process and equal protection in connection with certain factual allegations. In their Dispositive Motion, Defendants do not address the Fourteenth Amendment. Defendants generally discuss Mr. Winrow's Complaint as alleging Eighth Amendment violations in connection with those underlying factual allegations, and Mr. Winrow does not challenge Defendants' understanding of these claims. To ensure proper consideration of all claims, the undersigned addresses the applicability of the Fourteenth Amendment to Mr. Winrow's claims as needed and, thus, discusses the substantive standard for such claims below.

a. Claim of Due Process Violation

The Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. This "Due Process Clause" is intended to protect against governmental abuses of power by providing (1) procedural protections—i.e., requiring procedures in connection with certain deprivations of life, liberty, or property; and (2) substantive protections—i.e., prohibiting certain government conduct regardless of protective procedures. *See Daniels*, 474 U.S. at 331. A claim involving negligent conduct, i.e., one alleging a lack of due care, "does not implicate the Due Process Clause of the Fourteenth Amendment," regardless of whether procedural or substantive violations are alleged. *See id.* at 332-34; *Davidson v. Cannon*, 474 U.S. 344, 348 (1986); *see also Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 848-49 (1998).

Because, as detailed below, Mr. Winrow's relevant factual allegations do not involve a lack of procedure, the undersigned construes Mr. Winrow's Complaint as implicating only the substantive component of the Due Process Clause. *See Dodds*, 614 at 1205 n.12; *see also Whitley v. Albers*, 475 U.S. 312, 326 (1986). When a type of claim is covered by a specific constitutional provision, the standards for that provision must be used to analyze the claim rather than "the more generalized notion of 'substantive due process.'" *See Graham v. Connor*, 490 U.S. 386, 395 (1989); *see also Cnty. of Sacramento*, 523 U.S. at 842-43; *Whitley*, 475 U.S. at 327. For instance, when a convicted prisoner alleges claims of unsanitary prison conditions (as Mr. Winrow does), the Eighth Amendment's Cruel and Unusual Punishment Clause is the proper

constitutional provision under which to analyze such claims because that provision, as interpreted, specifically requires prison officials to provide humane conditions to avoid imposing cruel and unusual punishment on the prisoner. *See, e.g.*, *Rhodes*, 452 U.S. at 344-47, 351-52; *DeSpain*, 264 F.3d at 971-77; *Mitchell v. Maynard*, 80 F.3d 1433, 1441-43 (10th Cir. 1996). Thus, such claims should not be analyzed under substantive due process standards.

      b.  Claim of Equal Protection Violation

The Fourteenth Amendment's Equal Protection Clause generally requires like treatment among similarly situated persons and limits a state's ability to burden a fundamental right or to target a suspect class. *See Romer v. Evans*, 517 U.S. 620, 631 (1996); *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). Thus, a plaintiff who alleges a violation of his or her rights under the Equal Protection Clause must initially provide sufficient facts that, when assumed to be true, establish impermissible unequal treatment by a defendant. *See Barney v. Pulsipher*, 143 F.3d 1299, 1312 (10th Cir. 1998).

    *C.  Whether Mr. Winrow Has Stated a Plausible § 1983 Claim or Supported a § 1983 Claim for Purposes of Defeating Summary Judgment*

Any official-capacity claims under § 1983 that remain in this civil action implicate municipal liability because the remaining Defendants are or, at the relevant time, were employees of a municipality, Pottawatomie County, via the PCPSC. *See Graham*, 473 U.S. at 165-66; Compl. at 1; Order, Doc. No. 58. As noted above, to establish such a claim, a plaintiff must initially identify an official policy or custom fairly attributable to

the relevant municipality.  *See Schneider*, 717 F.3d at 769-70.  Mr. Winrow's factual allegations, discussed below, clearly implicate only one alleged policy of the PCPSC—related to its copayments for medical services—and thus, whether Mr. Winrow has established an official-capacity claim is addressed in the section (Part C.3.a.iv) below that also addresses the copayment-related allegations.  Because Mr. Winrow has identified no other official policy or custom fairly attributable to Pottawatomie County, the undersigned construes Mr. Winrow's remaining claims under § 1983 as individual-capacity claims only.

    1.  <u>Claims Related to Water Jug Placement</u>

In his Complaint, Mr. Winrow alleges that on August 11, 2013, one or both of Defendants Powell and Hisaw placed a five-gallon water jug on a staircase in Pod-A's common area (also referred to as the "dayroom") for the lunchtime meal.  *See* Compl. at 5, 6, 7; Compl. Aff. at 2, 4.  Mr. Winrow further alleges that Defendants Stell, Thompson, and Solis "allowed" this placement to occur.  *See* Compl. at 4, 5, 8.  Mr. Winrow states that, due to insufficient seating at tables in the common area and all inmates being locked out of cells during meals, he sat on the staircase—a few steps above the water jug—to eat his lunch.  *See id.* at 2, 4; Compl. Aff. at 2-3.  Mr. Winrow alleges that he "stood to take his tray back[,] . . . stepped into a pool of water and lost [his] footing," causing him to fall onto other inmates before "rolling," along with the water jug, eight steps to the floor.  Compl. Aff. at 3; *see also* Compl. Exs. at 26-28 (providing three witness' declarations).  Mr. Winrow states that his shoulder, knee, and back were injured in the fall.  Compl. Aff. at 3.

Mr. Winrow presents the above factual allegations and evidence in support of a contention that his rights under the Fourteenth Amendment's Due Process and Equal Protection Clauses were violated. *See* Compl. at 3, 4, 5, 6, 7, 8. In their Dispositive Motion, Defendants contend that "the placement of any water jug on a stair does not amount to a violation of any inmate's civil rights" but discuss Mr. Winrow's claims only in the context of the Eighth Amendment. *See* Defs.' Disp. Mot. at 20-21, 28. Thus, the undersigned first considers whether Defendants are entitled to summary judgment as to this claim when construed as one involving the Eighth Amendment. Further, accepting this claim as alleging a violation of the Fourteenth Amendment Due Process Clause or Equal Protection Clause (as asserted by Mr. Winrow), the undersigned—pursuant to the Court's independent screening authority—considers whether Mr. Winrow has stated a claim upon which relief may be granted.

a. Eighth Amendment Claims

In their Dispositive Motion, Defendants contend that Mr. Winrow never fell down the stairs, offering video surveillance from the August 11, 2013 lunchtime meal in support. *See* Defs.' Disp. Mot. at 10-11; 20-21; Defs.' Disp. Mot. Ex. 2, Doc. No. 45 (conventionally filed video exhibit). In his Response, Mr. Winrow agrees that the video reflects the general conditions in his unit at the PCPSC, but he asserts that Defendants submitted a video from a date other than the date in question and altered the video's date stamp. *See* Pl.'s Resp. at 3-4. Mr. Winrow also presents a letter from Defendant Thompson, stating that the video from the August 11, 2013 lunchtime meal showed that Mr. Winrow *did* fall down the stairs. Pl.'s Resp. Ex. 2, Doc. No. 43-2. Defendant

Thompson denies that she wrote the letter presented by Mr. Winrow, with Defendants suggesting that Mr. Winrow may have fabricated the letter. *See* Defs.' Reply at 3-4; Defs.' Reply Ex. 1, Doc. No. 50-1, at 2-4. Mr. Winrow denies this allegation and reasserts the letter's authenticity. *See* Pl.'s Supplemental Br. at 4-5, 7. These factual disputes are not material, however, because even when viewing the facts in Mr. Winrow's favor, no Eighth Amendment violation is established.

When an injury occurs due to slippery conditions, any remedy for that injury is typically sought through a state-law tort claim. *Reynolds v. Powell*, 370 F.3d 1028, 1031 (10th Cir. 2004). Because slippery conditions "constitute a daily risk faced by members of the public at large," such conditions in prison—although potentially hazardous—generally, "do[] not amount to cruel and unusual punishment." *Id.* (collecting cases); *see also Tunstall v. Rowe*, 478 F. Supp. 87, 89 (N.D. Ill. 1979) ("[The] plaintiff's injury on the greasy stairs is not cognizable as cruel and unusual punishment in the federal courts.").

Assuming Mr. Winrow's version of events to be true, Mr. Winrow was aware of the water jug's placement before deciding to sit a few steps above the jug to eat his lunch. *See* Compl. at 6-7; Compl. Aff. at 2-3. Mr. Winrow then slipped in water from the jug when later descending the staircase, causing him to fall. *See* Compl. Aff. at 3. These allegations are not readily distinguishable from a typical slip and fall negligence case involving a member of the general public. *See Reynolds*, 370 F.3d at 1031-32. Further, these allegations are not suggestive of a "serious deprivation of basic human needs" or "the wanton and unnecessary infliction of pain." *See Rhodes*, 452 U.S. at 347. Quite

simply, Mr. Winrow's factual allegations are not objectively sufficiently serious "to require [the Court] to depart from the general rule barring Eighth Amendment liability in prison slip and fall cases." *See Reynolds*, 370 F.3d at 1031-32.

Even construing the facts and evidence in the light most favorable to Mr. Winrow, Mr. Winrow has failed to establish an Eighth Amendment violation as to this condition of confinement. The undersigned concludes that, to the extent such a violation was alleged, Defendants are entitled to qualified immunity in their individual capacities as to this claim, and the undersigned recommends that summary judgment be granted accordingly. *See* Fed. R. Civ. P. 56(a), (c)(1); *Pearson*, 555 U.S. at 232, 236; *Olsen*, 312 F.3d at 1312.

### b. Fourteenth Amendment Claims

As noted, in his Complaint, Mr. Winrow contends that the above factual allegations demonstrate a violation of his rights under the Fourteenth Amendment. *See* Compl. at 3, 4, 5, 6, 7, 8. Although Defendants did not expressly address such claims in their Dispositive Motion, the undersigned addresses those claims now under the Court's screening authority and determines that Mr. Winrow has failed to state a claim upon which relief may be granted. *See* 28 U.S.C. §§ 1915(e)(2)(B)(ii), 1915A(b)(1); 42 U.S.C. § 1997e(c)(1).

Mr. Winrow's factual allegations are indistinguishable from allegations of negligence—a lack of due care—thereby failing to present a cognizable claim under the Fourteenth Amendment's Due Process Clause. *Daniels*, 474 U.S. at 332-34; *Davidson*, 474 U.S. at 348; *Cnty. of Sacramento*, 523 U.S. at 848-49. In fact, Mr. Winrow's allegations are comparable to those in *Daniels*, in which a prison custodian was alleged to

have negligently left a pillow on a prison staircase, causing a prisoner to slip, fall, and suffer injuries. *Daniels*, 474 U.S. at 328, 332. The Supreme Court found such actions to be "quite remote" from the abuse-of-power concerns addressed by the Due Process Clause and, accordingly, held that the Due Process Clause did not afford the prisoner a remedy. *Id.* at 332, 336. Mr. Winrow's factual allegations are similarly quite remote from those concerns—suggesting instead a mere lack of due care at most. Thus, as to the water jug placement, Mr. Winrow has failed to state a claim under § 1983 upon which relief may be granted for a Fourteenth Amendment Due Process Clause violation. Such claims against Defendants in their individual capacities should be dismissed. *See* 28 U.S.C. §§ 1915(e)(2)(B)(ii), 1915A(b)(1); 42 U.S.C. § 1997e(c)(1).

As to any alleged Equal Protection Clause violation, Mr. Winrow does not identify similarly situated persons who were treated disparately. *See City of Cleburne*, 473 U.S. at 439. Nor do Mr. Winrow's allegations suggest that Defendants' actions impermissibly burdened a fundamental right or targeted a suspect class. *See Romer*, 517 U.S. at 631. Thus, as to the water jug placement allegations, Mr. Winrow has failed to state a claim upon which relief may be granted under § 1983 for a Fourteenth Amendment Equal Protection Clause violation. Such claims against Defendants in their individual capacities should be dismissed. *See* 28 U.S.C. §§ 1915(e)(2)(B)(ii), 1915A(b)(1); 42 U.S.C. § 1997e(c)(1).

2. Claims Related to Unsanitary Conditions

Mr. Winrow alleges that certain unsanitary conditions existed at the PCPSC and contends that these conditions violated his rights under the Due Process and Equal

Protection Clauses of the Fourteenth Amendment, while also referencing the Eighth Amendment's Cruel and Unusual Punishment Clause. *See* Compl. at 3-8; Compl. Aff. at 7-10; Compl. Exs. at 16. As noted, the undersigned construes Mr. Winrow's due process claims as implicating only the substantive component of the Due Process Clause. A substantive due process analysis of Mr. Winrow's claims alleging unsanitary prison conditions would be improper, however, because such claims are specifically covered by the Eighth Amendment's Cruel and Unusual Punishment Clause. *See Graham*, 490 U.S. at 395; *Rhodes*, 452 U.S. at 344-47, 351-52; *DeSpain*, 264 F.3d at 971-77. Thus, as Defendants did in their Dispositive Motion, the undersigned analyzes Mr. Winrow's unsanitary conditions claims under the Eighth Amendment. Then, under the Court's independent screening authority, the undersigned considers whether Mr. Winrow has stated a claim upon which relief may be granted for a Fourteenth Amendment Equal Protection Clause violation.

a.  Mealtime Seating

In his Complaint, Mr. Winrow alleges that, because of insufficient seating at tables in the dayroom and a prohibition against reentering one's cell during meals, he was limited to sitting on the floor or stairs while eating his meals, which were served on trays. *See* Compl. at 2, 4-8; Compl. Aff. at 2-3, 9-10. Mr. Winrow states that sitting on the floor "caused [him] to contaminate his food as he had to touch the floor each time he sat on it." Compl. at 8; *see also* Compl. Exs. at 16 (describing floor as "dirty"). Separately, Mr. Winrow asserts that another inmate with chronic diarrhea who "soiled his jumpsuit[]s daily" "contaminated" "every where [that] inmate sat or touched," but Mr. Winrow does

not clearly connect this allegation to any consequence to himself or to his food.  *See* Compl. Aff. at 8-9.

Specifically as to each Defendant, Mr. Winrow alleges: Defendant Stell "forced [Mr. Winrow] to eat meals on the floor"; Defendant Thompson "allowed her staff to make [Mr. Winrow] eat off the Pod floor"; Defendants Powell and Hisaw "made [Mr. Winrow] eat off the floor"; and Defendant Solis "as head of the medical unit would not order her staff to stop forcing [Mr. Winrow] to eat on the floor."  Compl. at 4-8.

Despite Mr. Winrow's phrasing above, which might be construed as stating that Mr. Winrow was required to eat food directly from the floor, it is undisputed that food was served on trays to inmates at the PCPSC.  *See* Defs.' Disp. Mot. at 16; Compl. at 2, 4-8; Compl. Aff. at 2-3, 9-10; Pl.'s Resp. at 2.  It is also undisputed that the PCPSC's available seating at tables was typically insufficient to accommodate all inmates and that some inmates sat on the floor or stairs during meals.  *See* Defs.' Disp. Mot. at 16; Compl. at 2; Compl. Aff. at 10.

Despite Mr. Winrow's repeated statements to the contrary, *see, e.g.*, Compl. at 2, 4, Defendants contend that it is an undisputed fact that "[i]nmates can sit . . . in their cell[s]" during meals, *see* Defs.' Disp. Mot. at 16.  Yet, in Defendant Powell's sworn Declaration—cited by Defendants—she states: "Inmates are *not* allowed to eat meals in their individual cells."  Defs.'  Disp. Mot. Ex. 7, Doc. No. 41-7, at 2 (emphasis added); *see also* Defs.' Disp. Mot. Ex. 12, Doc. No. 41-15, at 3 (listing only "at a table, on the floor or on the steps" as seating options during meals in Declaration of Defendant Thompson); Defs.' Disp. Mot. Ex. 13, Doc. No. 41-16, at 2 (same in Declaration of

Defendant Stell). *But see* Defs.' Disp. Mot. Ex. 8, Doc. No. 41-8, at 2 (stating in Declaration of Defendant Hisaw that during meals, inmates "can sit any where . . . in the unit including . . . their own cells").

In their Dispositive Motion, Defendants frame the issue as one involving inmate choice—i.e., asserting that despite limited seating at tables, inmates have the option of sitting at a table, on the floor or steps, or in their own cells during meals—and generally contend that this challenged condition is not sufficiently serious to implicate constitutional protection because "[the described mealtime] arrangement does not deprive an inmate of any essentials or pose any 'substantial risk of serious harm.'" *See* Defs.' Disp. Mot. at 16, 26-27. Put another way, Defendants contend that, as to this challenged condition, Mr. Winrow has submitted insufficient evidence to establish the objective component of an Eighth Amendment claim. *See id.* Defendants do not directly address Mr. Winrow's claim that his food became "contaminate[d]" from his touching of the floor when sitting down before touching his food. *See id.*

In his Response, Mr. Winrow reiterates the basic factual allegations in his Complaint and accompanying filings as to this challenged condition, including that the floor was "dirty." Pl.'s Resp. at 2, 3-4, 12. Neither party further discusses the condition expressly. *See* Defs.' Reply at 2-8; Pl.'s Supplemental Br. at 2-5.

Regardless of whether PCPSC inmates were permitted to consume meals in their cells, Mr. Winrow has not established the objective component of this Eighth Amendment claim—i.e., that the condition was "sufficiently serious to implicate constitutional protection" by posing a substantial risk of serious harm to Mr. Winrow's

health or safety. *See DeSpain*, 264 F.3d at 971, 973. Mr. Winrow has presented no such evidence beyond his own sparse statements that sitting on the "dirty" floor "caused [him] to contaminate his food as he had to touch the floor each time he sat on it" during his meals at the PCPSC for approximately 23 days. *See* Compl. Exs. at 16; Compl. at 8; Compl. Aff. at 2, 10.

A "dirty" floor and "contamination" from that floor, without clear elaboration and evidentiary support as to these circumstances or consequences therefrom, do not permit a reasonable inference that a *substantial* risk of *serious* harm existed. *See DeSpain*, 264 F.3d at 973-74 (emphasizing factual intensiveness of court's Eighth Amendment analysis); *Self*, 439 F.3d at 1230. The undersigned does not suggest that unsanitary meal service could never give rise to an Eighth Amendment violation, but not every surface— even a floor—is so inherently unsanitary that touching it poses a substantial risk of serious harm. Mr. Winrow simply has not presented sufficient evidence of the circumstances at the PCPSC such that would permit a reasonable conclusion that the challenged condition was inhumane and, therefore, unconstitutional. Even if considering Mr. Winrow's allegation that an ill inmate "contaminated" some surfaces by sitting on or touching them, such allegations are insufficient to defeat a motion for summary judgment without evidence as to the seriousness of the alleged contamination and the unavoidability of the particular area. *See Self*, 439 F.3d at 1230.

Considering the evidence and the inferences drawn from the record in the light most favorable to Mr. Winrow as the nonmoving party, the undersigned finds that Mr. Winrow has failed to establish the objective component of this claim and has thus failed

to show that an Eighth Amendment violation occurred.  *See DeSpain*, 264 F.3d at 971, 973-74.  The undersigned therefore concludes that Defendants are entitled to qualified immunity in their individual capacities as to this claim, and the undersigned recommends that summary judgment be granted accordingly.  *See* Fed. R. Civ. P. 56(a), (c)(1); *Pearson*, 555 U.S. at 232, 236; *Olsen*, 312 F.3d at 1312.

b.  Mealtime Water Source

In his Complaint, Mr. Winrow states that after he fell down the stairs on August 11, 2013, the water jug was no longer placed in the unit for meals.  Compl. at 2; *see also* Compl. Aff. at 10.  Instead, because they could not return to their cells, inmates could obtain water during mealtimes only "from the dayroom toilet sink where inmates with [Crohn's Disease], inflamed hernia, wash[ed] their soiled underwear."  Compl. at 2; *see also* Compl. Aff. at 8-9 (describing two named Cleveland County inmates with "'serious illnesses'"—one with "uncontrol[l]able" diarrhea attributed to Crohn's disease and the other with leakage of bodily fluids attributed to an allegedly untreated hernia—who washed themselves and their soiled clothing in the "dayroom toilet sink").  Mr. Winrow appears to allege that these circumstances persisted for over three weeks.  *See* Compl. at 2; Compl. Aff. at 10.  As to each Defendant, Mr. Winrow specifically alleges in his Complaint as follows:

- Defendant Stell, "after learning of [Mr. Winrow's fall and] injury[,] took the water jug and made [Mr. Winrow] drink water during meals from toilet in the dayroom" and "denied cleaning supplies to clean with."  Compl. at 4; *see also id.* (alleging Defendant Stell "would not bring [Mr. Winrow] fresh water to drink during meals, nor supply cleaning tools to clean with, toilet brush, shower brush").

- Defendant Thompson "allowed her staff to make [Mr. Winrow] . . . drink from the dayroom toilet, with sick inmates washing their underwear in that sink." *Id.* at 5.

- Defendant Powell "made [Mr. Winrow] . . . drink water from the dayroom toilet." *Id.* at 6.

- Defendant Hisaw made Mr. Winrow "drink from the dayroom toilet." *Id.* at 7.

- Defendant Solis, "after learning of the [water jug-related] accident[,] allowed her staff to remove the water jug from the Pod during meals, and ordered [Mr. Winrow] to drink from the dayroom toilet sink," knowing "she had inmates with [Crohn's Disease], inflamed hernia[]s, that were bleeding from their rectum[]s, and washing their underwear in the sink." *Id.* at 8; *see also id.* (alleging Defendant Solis did not "stop the Pod Officer[]s from ordering [Mr. Winrow] to . . . drink from toilet sink that inmates wash bloody underwear in daily").

Additionally, in a Grievance dated August 15, 2013, and addressed to Defendant Stell, Mr. Winrow states, "Our water jug has been taken and I['']m being forced to drink water from the toilet faucet in the dayroom[;] two dayroom inmates are bleeding from their rectum[s] d[ue] to their illness and washing their underwear in the sink I['']m drinking from." Compl. Exs. at 15. Mr. Winrow further states that the sink was not "properly cleaned or dis[i]nfected" because he was "not being given any . . . disinfectant to clean it with." *Id.* at 16, 15. Finally, Mr. Winrow states, "I['']m sharing this toilet and drinking faucet with 30+ other inmates, and two of them are washing bloody underwear in that sink daily, sometimes hourly, d[ue] to them bleeding in their underwear, and inmate jumpsuit." *Id.* at 16. There is no indication that Defendant Stell received this Grievance. *See id.* at 15 (stating "copy given to Officer Powell" and reflecting "N.

Powell" as "Receiving Officer").[8] No response to the Grievance is reflected on the form, and Mr. Winrow does not specifically mention this Grievance in his Complaint or its accompanying Affidavit.

In their Dispositive Motion, Defendants do not directly address Mr. Winrow's specific allegations regarding the ill inmates or whether disinfectant was provided. Instead, Defendants assert that "no inmate had to drink from a toilet as each individual cell has a sink, although the sink and toilet is a combined device, that has a water fountain and provides potable water[,] . . . which is a common fixture in jails." *See* Defs.' Disp. Mot. at 21; *see also* Defs.' Disp. Mot. Exs. 11a to 11d, Doc. Nos. 41-11 to 41-14 (providing photographs of combined device). Defendants state that such a combined device is also available in the dayroom for communal use. *See* Defs.' Disp. Mot. at 16. Defendants further state that "the sink combination does not cause an inmate to drink unsafe water as the sink and toilet never mix." *See id.* at 27. Defendants Stell and Thompson each declare, "An inmate is not required to use the sink or toilet in the unit day room area but can choose to use the toilet and/or sink in his own cell." Defs.' Disp. Mot. Ex. 13 ("Def. Stell's Decl."), Doc. No. 41-16, at 2; Defs.' Disp. Mot. Ex. 12 ("Def. Thompson's Decl."), Doc. No. 41-15, at 4. These Defendants also contend that they are not "aware of [the combined device] causing any health problems to any inmate

---

[8] It is not clear whether Mr. Winrow or Defendant Powell completed the "Receiving Officer" section of the Grievance form. *See* Compl. Exs. at 15. The remaining sections of the form for an "Answering Officer" and "Administrator" to sign, as well as a section titled "ACTION TAKEN///RESPONSE," are blank. *See id.*

at the PCPSC." Def. Stell's Decl. at 3; Def. Thompson's Decl. at 4. Defendants do not expressly address whether Mr. Winrow ever complained regarding this challenged condition while at the PCPSC or whether they were aware at the relevant time of the condition as described by Mr. Winrow. Defendants maintain as a general matter that "inmates are provided cleaning supplies to help maintain cleanliness in their cells and the day room area and provided clean clothing on a regular basis."[9] *See* Defs.' Disp. Mot. at 28.

In response, Mr. Winrow makes clear that he is alleging that the dayroom sink itself was unsanitary, not that water from the toilet bowl was his source of drinking water during meals. *See* Pl.'s Resp. at 2, 8. Reiterating that the two ill inmates washed their soiled clothing in the dayroom sink, Mr. Winrow states that the "sink had human [fecal] matter, and blood splatter all over it, and smelled of human waste."[10] *Id.* at 8; *see also id.* at 10. Mr. Winrow asserts that "[t]he Pod Officers would not supply basic cleaning material for the sink." *Id.* at 2. Mr. Winrow states that he "could not drink water from his housing cell d[ue] to the inmates being 'Ordered' to close the cell door[]s before any . . . meal trays came into the Pod." *Id.* at 8; *see also id.* at 10.

---

[9] Defendants do not specify which cleaning supplies, if any, were provided directly to Mr. Winrow and do not specify how often clean clothing would be provided. *See* Defs.' Disp. Mot. at 28.

[10] The undersigned notes that Mr. Winrow's Response was not signed under penalty of perjury in its entirety, including as to the assertions cited in this section of the analysis. *See* Pl.'s Resp. at 15, 16, 17. Even if the Response were so sworn, it would not affect the undersigned's conclusions in this Report and Recommendation.

In their Reply, Defendants again do not address Mr. Winrow's specific allegations, instead asserting that: (1) Mr. Winrow's factual allegations seem unlikely to be true because the existence of such circumstances would violate various PCPSC policies; (2) even if the circumstances existed as alleged, Mr. Winrow has put forth no evidence that he "suffered any illness or injury" or was "harm[ed] or deprived . . . of any essential life needs"; and (3) Mr. Winrow has put forth "no evidence that any of the Defendants knew of [the circumstances alleged above] and refused to take any action or provide additional cleaning supplies if requested." *See* Defs.' Reply at 5-6. Defendant Thompson submitted an additional Declaration, stating, "I am not aware of and have not been advised of Mr. Winrow ever requesting cleaning supplies and being denied those supplies by a staff [member]. I am not aware of other complaints by other inmates concerning inmates washing clothes in a sink or practicing other allegedly unhealthy habits." Defs.' Reply Ex. 1, Doc. No. 50-1, at 4.

In his Supplemental Brief, Mr. Winrow asserts under penalty of perjury that he submitted Grievances to Defendant Thompson, "complaining about the inmates with [Crohn's Disease] & inflamed Hernia, washing their clothing, Jumpsuits in the dayroom Drinking Sink." *See* Pl.'s Supplemental Br. at 3, 6. Mr. Winrow does not, however, present a copy of any such Grievance or explain why he has not provided documentary support for the assertion.

Based on the above information, it is undisputed that the water jug was removed from the unit at some point after August 11, 2013. *See* Compl. at 2; Defs.' Disp. Mot. Ex. 3, Doc. No. 41-3, at 4; Defs.' Disp. Mot. Ex. 8, Doc. No. 41-8, at 2. The parties

dispute, however, whether inmates could obtain water only from the communal sink in the dayroom or could obtain water for meals from the sinks in their respective cells. The parties also dispute—to the extent that Defendants address the issue—whether ill inmates used the dayroom sink to wash clothing soiled with bodily fluids and to what extent cleaning supplies were provided to clean the dayroom sink. Finally, the parties dispute whether each Defendant had knowledge of the alleged unsanitary condition.

To be clear, Mr. Winrow's allegations as to this challenged condition, as well as others discussed below, involve only the communal combined device in the dayroom. *See* Compl. at 2, 4-8; Compl. Aff. at 9. That is, Mr. Winrow's factual allegations do not involve the combined device in his cell. Further, Mr. Winrow's allegations involve mealtimes only: Mr. Winrow alleges that, for the up to 18 days he was at PCPSC, he was unable to obtain water from a "*properly* cleaned or dis[i]nfected" source during meals.[11] *See* Compl. Aff. at 10; Compl. Exs. at 16 (emphasis added).

Viewing the evidence and reasonable inferences in the light most favorable to Mr. Winrow shows that he was required to choose between forgoing water during meals or drinking water obtained from a source that had not been disinfected (and possibly not

---

[11] It is unclear whether Mr. Winrow alleges that he was denied cleaning supplies entirely or just denied the specific cleaning supplies that he lists—i.e., disinfectant, toilet brushes, and shower brushes. *See* Compl. at 2, 4, 8; Compl. Exs. at 15-16. However, this discrepancy need not be resolved for the analysis that follows. In the video evidence submitted by Defendants, which Mr. Winrow agrees reflects the conditions of the unit, inmates can be seen using cups to drink water drawn from the water jug. Neither party addresses whether, after the water jug was removed, cups continued to be available to inmates to bring water out of their cells before mealtimes. The undersigned assumes, in Mr. Winrow's favor, that cups were not available upon removal of the water jug.

cleaned at all) after exposure to human waste and bodily fluids. The undersigned finds that Mr. Winrow has failed to establish that this condition was sufficiently serious to implicate constitutional rights.

If Mr. Winrow found the dayroom sink to be unsanitary, he presents no reason why he could not have avoided it entirely by electing to drink water from the sink in his cell—which he does not allege was unsanitary—at any time before and after meals. Such avoidance would have resulted at most in only relatively brief deprivations of water—not substantial deprivations of a basic need, as required for an Eighth Amendment violation. Instead, Mr. Winrow opted to drink from the dayroom sink during meals, knowingly exposing himself to the sink's allegedly unsanitary condition. Although he states that Defendants either "made" him drink from the dayroom sink or "ordered" him to drink from it, he provides no context for Defendants taking such alleged actions. For instance, he does not allege facts or present evidence to establish that any Defendant actually forced him—whether physically or through a threatened consequence—to drink from the dayroom sink. It would be unreasonable to infer such circumstances from the available evidence—i.e., Mr. Winrow's sparse statements—and would involve mere speculation as to Defendants' intent, which is insufficient to defeat a motion for summary judgment. *See Self*, 439 F.3d at 1230. Essentially, although an unsanitary sink may objectively pose a substantial risk of serious harm to an inmate's health or safety, such cannot be the case when an inmate such as Mr. Winrow seemingly has the option to avoid a known risk entirely without facing a substantial deprivation of a basic need. *Cf. DeSpain*, 264 F.3d at 974-75.

Considering the evidence and the inferences drawn from the record in the light most favorable to Mr. Winrow as the nonmoving party, the undersigned finds that Mr. Winrow has failed to establish the objective component of this claim and has thus failed to show that an Eighth Amendment violation occurred. *See id.* at 971, 973-74. The undersigned therefore concludes that Defendants are entitled to qualified immunity in their individual capacities as to this claim, and the undersigned recommends that summary judgment be granted accordingly. *See* Fed. R. Civ. P. 56(a), (c)(1); *Pearson*, 555 U.S. at 232, 236; *Olsen*, 312 F.3d at 1312.

### c. Communal Shower and Toilet

Mr. Winrow alleges in his Complaint that "there [were] no toilet brushes for shower or stool nor sink which caused [Mr. Winrow] to have skin rashes on his thigh[]s and buttock[]s areas, and caused [Mr. Winrow] to catch Athlete[']s foot rashes that burned and blistered." Compl. at 2. As noted above, Mr. Winrow states that Defendant Stell "denied cleaning supplies" and "would not supply cleaning tools to clean with, toilet brush, shower brush." *Id.* at 4. Additionally, in the August 15, 2013 Grievance addressed to Defendant Stell, Mr. Winrow states, "I have foot/skin rashes on my thighs and buttocks from sitting on the toilet that isn[']t being cleaned," noting further that he was "sharing this toilet . . . with 30+ other inmates." Compl. Exs. at 15-16 (referring to communal combined device in dayroom). As discussed above, there is no indication in the record that Defendant Stell ever received the Grievance. *See id.* at 15 (stating "copy

given to Officer Powell" and reflecting "N. Powell" as "Receiving Officer").[12]   No response to the Grievance is reflected on the document itself, and Mr. Winrow does not specifically address this Grievance in his Complaint or its accompanying Affidavit.

Mr. Winrow also states that he "encountered skin and foot rashes while under the security and control[] of [Defendant Solis] d[ue] to no cleaning brushes for toilet[]s and shower stall[]s." Compl. at 8.  Mr. Winrow's allegation that he was denied medical care for these skin conditions is addressed in a separate section below.  Mr. Winrow's allegations as to this challenged condition do not involve Defendant Thompson or Defendant Hisaw.

In their Dispositive Motion, without addressing many of Mr. Winrow's specific allegations, Defendants state that "inmates are provided cleaning supplies to help maintain cleanliness in their cells and the day room area." *See* Defs. Disp. Mot. at 28. Defendants then assert, "More importantly, no staff member is aware of any outbreak of rashes or similar illnesses on Mr. Winrow or any other inmate due to unclean cells, sinks, toilets or showers." *Id.* at 28.

In response, Mr. Winrow notes only that Defendants do not specifically deny his allegation that he "was[n't] provided with . . . cleaning product[]s to clean the toilet [or] shower." *See* Pl.'s Resp. at 14.   In their Reply, Defendants again do not directly address—or expressly deny—Mr. Winrow's allegations as to this challenged condition.

---

[12] Again, it is not clear whether Mr. Winrow or Defendant Powell completed the "Receiving Officer" section of the Grievance form, and the remaining sections of the form are blank.  *See* Compl. Exs. at 15.

Instead, Defendants assert that "there is no evidence that any of the Defendants knew of this activity and refused to take any action or provide additional cleaning supplies if requested."[13]  *See* Defs.' Reply at 5.

Regardless of whether Mr. Winrow has shown a sufficiently serious condition to implicate constitutional rights, he has failed to establish that any Defendant was deliberately indifferent to the condition and thus has failed to establish the subjective component of an Eighth Amendment claim.

As to Defendant Powell, even if she received a copy of Mr. Winrow's August 15, 2013 Grievance, as indicated on that form, Mr. Winrow never alleges that he requested cleaning supplies from Defendant Powell or that Defendant Powell was involved in the denial of any cleaning supplies.[14]  *See* Compl. at 6.  Similarly, Mr. Winrow never describes any circumstances in which Defendant Solis was involved directly or indirectly in the denial of any cleaning supplies.  *See id.* at 8.  As noted, Mr. Winrow's allegations as to this challenged condition do not involve Defendant Thompson or Defendant Hisaw whatsoever.  *See id.* at 5, 7.  Without establishing these Defendants' personal involvement in the circumstances alleged, Mr. Winrow cannot establish that they

---

[13] Defendants also assert that they "did address the allegations of uncleanliness in a general 'conditions of confinement' argument [in their Dispositive Motion] and through supporting documentation" but do not cite such argument or documentation.  *See* Defs.' Reply at 5.

[14] In his Response, Mr. Winrow asserts that "[t]he Pod Officers would not supply basic cleaning material for the sink."  Pl.'s Resp. at 2.  However, he does not identify those Pod Officers.  *See id.*

exhibited the requisite deliberate indifference.  *See Farmer*, 511 U.S. at 834-37; *DeSpain*, 264 F.3d at 971-72.

Further, although it is addressed to Defendant Stell, there is no indication that Defendant Stell received the August 15, 2013 Grievance.[15]  Mr. Winrow's barebones assertions in his Complaint that Defendant Stell "denied cleaning supplies" and "would not supply cleaning tools to clean with, toilet brush, shower brush," Compl. at 4, are insufficient alone—i.e., without details regarding the circumstances of the alleged denials or failures to act—to establish that Defendant Stell acted with the requisite deliberate indifference, because reaching such a conclusion would involve mere speculation as to Defendant Stell's state of mind.  *See Farmer*, 511 U.S. at 834-37; *Self*, 439 F.3d at 1230, 1235-36; *DeSpain*, 264 F.3d at 971-72.  That is, even assuming Defendant Stell acted or failed to act as described, Mr. Winrow has put forth no evidence of the extent of the information provided to Defendant Stell and whether Defendant Stell was aware of any excessive risk to Mr. Winrow's health or safety as to this challenged condition.

Considering the evidence and the inferences drawn from the record in the light most favorable to Mr. Winrow as the nonmoving party, the undersigned finds that Mr. Winrow has failed to establish the subjective component of this claim and has thus failed to show that an Eighth Amendment violation occurred.  *See Farmer*, 511 U.S. at 834-37; *DeSpain*, 264 F.3d at 971-72.  The undersigned therefore concludes that Defendants are

---

[15] The evidentiary material before the Court at most indicates that Defendant Powell received the Grievance.  *See* Compl. Exs. at 15.  *But see supra* note 8 (noting that Grievance lacks clear indicia that even Defendant Powell received it).

entitled to qualified immunity in their individual capacities as to this claim, and the undersigned recommends that summary judgment be granted accordingly. *See* Fed. R. Civ. P. 56(a), (c)(1); *Pearson*, 555 U.S. at 232, 236; *Olsen*, 312 F.3d at 1312.

> d. Exposure to Other Inmates

Liberally construed, Mr. Winrow's factual allegations in his Complaint and its accompanying Affidavit involve an additional, related claim not clearly addressed by Defendants in their Dispositive Motion. The sufficiency of this claim is addressed under the Court's independent screening authority and without consideration to matters beyond the pleadings.

In his Complaint and its accompanying Affidavit, Mr. Winrow describes two "sick" Cleveland County inmates with "'serious illnesses'" that "were allowed to live" in his housing unit. *See* Compl. Aff. at 7-10; Compl. at 2. As noted above, one inmate is alleged to have suffered from Crohn's disease and the other is alleged to have suffered from a hernia. *See* Compl. Aff. at 8-10; Compl. at 2, 8. Mr. Winrow does not allege that he was housed in a cell with either of the inmates, and his exposure to these inmates appears to have been limited to time spent in the dayroom. *See* Compl. Aff. 7-10.

Although it may be possible to bring a prison conditions claim based on deliberately indifferent exposure to another inmate with a disease, the plaintiff must initially allege facts to show that the disease itself presented a sufficiently serious risk— likely limited to serious, communicable diseases. *See Helling v. McKinney*, 509 U.S. 25, 33-34 (1993); *Dunn v. White*, 880 F.2d 1188, 1195-97 (10th Cir. 1989) (discussing issue in context of whether forced testing for serious, communicable diseases in prison is

permissible and possibly obligatory). Mr. Winrow does not allege that either inmate suffered from a communicable disease that posed a serious risk to Mr. Winrow's health. *See* Compl. at 2, 8; Compl. Aff. at 8-10. That is, Mr. Winrow alleges no facts to suggest that the inmates' noncontagious afflictions themselves—Crohn's Disease and a hernia— posed a substantial risk of serious harm to Mr. Winrow. Mr. Winrow's allegations focus instead on unsanitary conditions created by the inmates' alleged medical issues, which have been addressed above. Thus, to the extent that Mr. Winrow is alleging that any Defendant violated his Eighth Amendment rights or his substantive due process rights under the Fourteenth Amendment by exposing him to inmates with the medical conditions described above, he has failed to state a claim upon which relief may be granted and any such claim should be dismissed. *See* 42 U.S.C. § 1997e(c)(1); 28 U.S.C. §§ 1915(e)(2)(B)(ii), 1915A(b)(1).[16]

---

[16] Mr. Winrow also complains about "ha[ving] to smell the human waste coming off [one of the ill inmate's] clothing" during mealtimes because the inmate was assigned to a bed in the dayroom. *See* Compl. Aff. at 8. Mr. Winrow also notes that while he was eating, "inmates urinated and rel[ie]ved themselves," but Mr. Winrow does not elaborate on this point. *See* Compl. at 4; *see also* Compl. Exs. at 15 (stating "inmates are urinating and taking dumps in the toilet while I[']m eating breakfast, lunch, and dinner"); *Whitney*, 113 F.3d at 1173-74. As to the latter statement, Mr. Winrow appears to be referencing the undisputed fact that inmates could and did use the communal toilet behind a curtain in the dayroom, as reflected in Defendants' video exhibit. If Mr. Winrow intended these factual allegations to support separate conditions-of-confinement claims, his factual allegations are insufficient to show that the conditions were sufficiently serious or that a particular Defendant knowingly and recklessly disregarded a substantial risk of serious harm to Mr. Winrow as to these alleged conditions. Accordingly, to the extent that separate claims were intended, they should be dismissed for failure to state a claim upon which relief may be granted. *See* 28 U.S.C. §§ 1915(e)(2)(B)(ii), 1915A(b)(1); 42 U.S.C. § 1997e(c)(1).

e.  Equal Protection

As noted, Mr. Winrow contends that the above factual allegations demonstrate a violation of his rights under the Fourteenth Amendment's Equal Protection Clause. *See* Compl. at 3.  Although Defendants did not expressly address such claims in their Dispositive Motion, the undersigned addresses those claims now under the Court's screening authority and determines that Mr. Winrow has failed to state a claim upon which relief may be granted. *See* 28 U.S.C. §§ 1915(e)(2)(B)(ii), 1915A(b)(1); 42 U.S.C. § 1997e(c)(1).

In the factual allegations of his pleading, Mr. Winrow does not identify similarly situated persons who were treated disparately. *See City of Cleburne*, 473 U.S. at 439. Nor do Mr. Winrow's allegations suggest that Defendants' actions impermissibly burdened a fundamental right or targeted a suspect class. *See Romer*, 517 U.S. at 631. Thus, as to the alleged unsanitary conditions at the PCPSC, Mr. Winrow has failed to state a claim upon which relief may be granted under § 1983 for a Fourteenth Amendment Equal Protection Clause violation.  Such claims against Defendants in their individual capacities should be dismissed. *See* 28 U.S.C. §§ 1915(e)(2)(B)(ii), 1915A(b)(1); 42 U.S.C. § 1997e(c)(1).

3.  Claims Related to Medical Care at the PCPSC

a.  Medical Care for Fall-Related Injuries

Mr. Winrow alleges that when he fell down the stairs on August 11, 2013, his "shoulder came out of socket" and his "knee was twisted from [his] foot being caught between 2 step[]s."  Compl. Aff at 3.  Mr. Winrow asserts that his "back, shoulder, and

knee [were] hurting real bad." *Id.* (emphasis omitted). Mr. Winrow asserts that Defendants violated his Eighth Amendment rights by denying him adequate medical care for these injuries while at the PCPSC. *See* Compl. at 2, 4, 5, 6, 7, 8; Compl. Aff. at 3-7.

In their Dispositive Motion, Defendants first contend that Mr. Winrow was not injured in the manner alleged—i.e., that he did not fall down the staircase on the specified date—suggesting instead that he possibly had a preexisting condition. *See* Defs.' Disp. Mot. at 10-11, 13-16, 23-24. As Defendants later note, however, "the real issue" is whether any Defendant deprived Mr. Winrow of adequate medical care in a manner that violated Mr. Winrow's Eighth Amendment rights. *See* Defs.' Reply at 4. In that regard, Defendants generally contend that Mr. Winrow has not established the subjective component of these Eighth Amendment claims against Defendants Stell, Thompson, Powell, Hisaw, and Solis. *See id.* at 23-26.

In the discussion of facts and evidence that follows, the undersigned has attempted to reconstruct the chronology of events related to Mr. Winrow's medical care at the PCPSC based on Mr. Winrow's statements under penalty of perjury in his Complaint and accompanying Affidavit, as well as the Complaint's Exhibits and additional Exhibits submitted by both Mr. Winrow and Defendants in support of their respective positions regarding Defendants' Dispositive Motion. Of note, both parties' Exhibits include copies of Requests for Medical Attention, Requests to Staff, and Grievances completed by Mr. Winrow while at the PCPSC. No party has disputed the authenticity of these documents. *See* Fed. R. Civ. P. 56(c)(2).

i. Individual-Capacity Claims Against Defendants Powell and Hisaw

Mr. Winrow states that, during a routine head count, he "showed [Defendants Powell and Hisaw his] dislocated shoulder, and swollen knee." Compl. at 6, 7. Mr. Winrow asserts that he then asked Defendants Powell and Hisaw "if [they] would call medical," but they did "not alert medical or remove [Mr. Winrow] from his . . . cell to investigate [his] injuries." *See id.* Although unclear from these specific allegations, Mr. Winrow appears to assert that the above events transpired on August 11, 2013—the date of the alleged fall—as understood from the context of the Complaint. *See id.*; Compl. Aff. at 3; *see also* Compl. Exs. at 14. Separately, Mr. Winrow presents a different version of events immediately after he fell, in which Defendant Hisaw is not mentioned:

> . . . I walked over to the wall and sat at my housing cell door. My back, shoulder, and knee, [were] hurting real bad. So I went inside my cell A-4, and lay[] down until the Officer came to do [a] head count again. I told [Defendant] Powell that I needed [a] Request for Medical Attention form, and when she brought it to me I filled it out and sent it to the medical unit, by handing it to Nurse Ms. Chalis.

*See* Compl. Aff. at 3 (emphasis omitted).

Mr. Winrow filed two documents dated August 11, 2013, as Exhibits: a Request for Medical Attention and a Grievance. The Request for Medical Attention appears to be the one that Mr. Winrow "hand[ed] . . . to Nurse Ms. Chalis," who is not a defendant in this civil action. *See* Compl. Exs. at 12; Compl. Aff. at 3; Compl. at 1-2. On that form, Mr. Winrow stated: "On or about 12:30 PM I was injured when I fell over the jug of water placed on the staircase. I hurt my knee and back during the incident[.] I[']m in need of pain medication please." Compl. Exs. at 12. Mr. Winrow's handwritten

timestamp indicates that the form was completed at 9:15 PM—approximately 9 hours after the alleged injury. *See id.* In a response also dated August 11, 2013, a staff member—whose signature appears to be "C Chalis LPN"—noted: "Ibuprofen given at 2300." *See id.*

Similarly, on the August 11, 2013 Grievance, Mr. Winrow explained: "I was coming down the stair case and slipped and fell on the water j[u]g which was on the stair steps at lunch. I hurt my knee and back during the incident and need some pain medication[]s please." Compl. Exs. at 11. In a response dated August 13, 2013, a staff member—whose signature appears to be "S Surdy," a nurse at PCPSC who is not a defendant in this lawsuit—noted that ibuprofen was provided. *See id.*; Compl. at 1-2; Defs.' Disp. Mot. Ex. 6, Doc. No. 41-6, at 3. Nurse Surdy further noted: "States fell and has had some tingling pain off and on since as well as soreness[;] no swelling noted [and] no open sores." Compl. Exs. at 11. Nurse Surdy also responded to a Request for Medical Attention from Mr. Winrow dated August 12, 2013, in which Mr. Winrow again requested pain medication for his knee and back. *See id.* at 13. In that response, dated August 13, 2013, Nurse Surdy noted: "States fell and twisted [right] knee[;] no swelling noted. No open abrasion. States neck a little sore." *Id.*

With his Complaint Exhibits, Mr. Winrow also included a Grievance dated August 12, 2013, and addressed to Defendant Powell, stating:

> Ms. Powell, on 8-11-13, while you were picking up lunch trays[,] I fell coming down the steps. You asked me if I was alright and brought me [a] medical request during your head count.

I[']m in pain and need to see the doctor[;] my head and knee [are] in pain and my back and shoulder hurt[] bad. Please call medical for me[;] my shoulder is still out of joint[.] Will you bring me another ice pack before you go home[?]

*Id.* at 14. It is not clear whether Defendant Powell received this Grievance because (1) it is unknown whether Mr. Winrow or Defendant Powell wrote "N. Powell" in the "Receiving Officer" section of this Grievance form; and (2) the remaining sections of the form are blank—i.e., sections for an "Answering Officer" and "Administrator" to sign, as well as a section titled "ACTION TAKEN///RESPONSE." *See id.*; *supra* note 8. At the top of the form, Mr. Winrow has written "Asst Dir - Ms. Thompson" and "Copy given to Officer Powell." *See* Compl. Exs. at 14. There is no indication on the form that Defendant Thompson received it. *See id.* Neither Mr. Winrow nor Defendants specifically address this Grievance in their respective filings.

Mr. Winrow's remaining Exhibits regarding his requests for medical care, discussed in a separate section below, do not involve either Defendant Powell or Defendant Hisaw, beyond Mr. Winrow's repetition of his allegations related to the water jug's placement. Nor do the statements in those Exhibits provide further insight into Mr. Winrow's contemporaneous reporting of his symptoms around the time Defendants Powell and Hisaw are alleged to have observed him after the fall.

Defendant Powell addresses some of Mr. Winrow's allegations through a Declaration, stating, "I do recall that at one point Mr. Winrow advised me that he had just

slipped and [fallen,] but I did not observe any fall."[17]  Defs.' Disp. Mot. Ex. 7 ("Def.

Powell's Decl."), Doc. No. 41-7, at 2.  Defendant Powell adds:

> When asked if he was injured, he responded that he would be fine.  I then told him that if he was injured he needed to put in a written request for medical care[.]  I observed Mr. Winrow at that time and did not notice any obvious signs of injuries including any limping, blood, cuts or bruising nor did he appear to be in any pain.

*Id.*  Defendant Powell states that "because [Mr. Winrow] did not appear to be injured,

[she] did not report [the alleged fall] to any supervisor, staff member, or medical service

staff member."  *Id.* at 3.  Defendant Powell also "recall[s] that there were times when Mr.

Winrow complained of pain" and states that she "instruct[ed] him to complete a medical

request."  *Id.*

Defendant Hisaw also addresses some of Mr. Winrow's allegations through a

Declaration, stating:

> At no time did [Mr. Winrow] ever advise me that he had fallen and injured himself as a result of water or the water jug nor did I ever observe him with any obvious injuries which might have been caused by a fall such as limping, swelling, bruising or other signs of any physical injuries.

Defs.' Disp. Mot. Ex. 8 ("Def. Hisaw's Decl."), Doc. No. 41-8, at 3.  Defendant Hisaw

adds, "At no time . . . did I observe or was I aware of any injuries to Mr. Winrow that

would have required any medical care."  *Id.* at 4.

---

[17] The undersigned assumes for the purposes of this Report and Recommendation that Defendant Powell's reference to "Harold Winrow" was inadvertent and she intended to refer to Defendant Billy Joe Winrow.  *See* Def. Powell's Decl. at 1.

Summarizing the above information, it is undisputed that neither Defendant Powell nor Defendant Hisaw contacted the PCPSC's medical unit on Mr. Winrow's behalf after his alleged fall on August 11, 2013.  *See* Compl. at 6, 7; Def. Powell's Decl. at 2-3; Def. Hisaw's Decl. at 3-4.  It is also undisputed that Mr. Winrow reported a fall to Defendant Powell, who inquired into whether Mr. Winrow was injured.  *See* Compl. at 6; Compl. Exs. at 14; Def. Powell's Decl. at 2.  The parties dispute whether Mr. Winrow showed any injuries to Defendants Powell and Hisaw, with Mr. Winrow's own account of events appearing to be inconsistent in this regard, and the parties further dispute whether Defendants Powell and Hisaw were obligated to take another action.  *See* Compl. at 6, 7; Compl. Aff. at 3; Compl. Exs. at 14; Def. Powell's Decl. at 2-3; Def. Hisaw's Decl. at 3-4.

Other than the statements made under penalty of perjury in his Complaint, no evidence supports Mr. Winrow's assertions that he presented symptoms—a "dislocated shoulder" and "swollen knee"—to Defendants Powell and Hisaw after the alleged fall or that he then asked Defendants Powell and Hisaw "if [they] would call medical."  *See* Compl. at 6, 7.  Mr. Winrow's Exhibits from August 11, 2013, which set forth his own contemporaneous statements, belie Mr. Winrow's suggestion that his symptoms required urgent care—or some other immediate response—that Defendants Powell and Hisaw knowingly failed to facilitate in reckless disregard of a substantial risk of serious harm to Mr. Winrow.  For instance, Mr. Winrow's first Request for Medical Attention was completed nine hours after the alleged incident, and in that Request, Mr. Winrow states simply that he "hurt [his] knee and back" "when [he] fell over the jug of water placed on

the staircase"—an injury for which he only requested "pain medication." *See* Compl. Exs. at 12. There is no indication that Mr. Winrow experienced any delay in obtaining a Request for Medical Attention form or was otherwise prevented from submitting a form sooner. *See* Compl. Aff. at 3; Compl. Exs. at 14. There is no indication that Mr. Winrow immediately reported any shoulder injury or described any symptoms suggestive of a dislocated shoulder. *See* Compl. Aff. at 3; Compl. Exs. at 12. Further, there is no indication that Mr. Winrow believed that he needed any immediate care beyond pain medication.[18] *See* Compl. Exs. at 12.

Mr. Winrow's August 11, 2013 Grievance and August 12, 2013 Request for Medical Attention echo the statements and the request in his August 11, 2013 Request for Medical Attention—mentioning only his knee and back and requesting only pain medication. *See id.* at 11 (stating that he "hurt [his] knee and back" because he "slipped and fell on the water j[u]g which was on the stair steps" and requesting "pain medication[]s"), 13 (stating that he "slipped and fell in some water on the staircase" and that he "need[ed] some pain medication for [his] knee and back"). Further, on his August 12, 2013 Request for Medical Attention, Mr. Winrow included a handwritten timestamp of "APP 12:30 PM," indicating that his request for a second dose of pain medication was

---

[18] Although Mr. Winrow states in his Complaint that he asked Defendants Powell and Hisaw "if [they] would call medical," after his alleged fall, he indicates in two other statements that he requested a Request for Medical Attention form from Defendant Powell, which was provided. *See* Compl. Aff. at 3; Compl. Exs. at 14. That is, regardless of whether Mr. Winrow requested immediate care, he appears to have been appeased with a medical request form, which he then waited approximately nine hours to submit. *See* Compl. Exs. at 12.

submitted more than 13 hours after the first dose of requested pain medication had been provided. *See id.* at 12, 13. Thus, from the available evidence, Mr. Winrow waited nine hours after the alleged fall before seeking only pain medication and was pacified for over 13 hours by the pain medication that was initially, undisputedly provided.

Such evidence fails to support a reasonable inference that Mr. Winrow presented symptoms on August 11, 2013, to Defendants Powell and Hisaw that were sufficiently indicative of a substantial risk of serious harm to Mr. Winrow, such that those Defendants could have knowingly and recklessly disregarded the risk. Such evidence also fails to support a reasonable inference that Defendant Powell or Defendant Hisaw—as non-medical staff members—improperly obstructed Mr. Winrow's access to medical care by delaying or failing to fulfill their roles as gatekeepers to such care. *See Self*, 439 F.3d at 1232. Although Defendants Powell and Hisaw did not contact the PCPSC medical unit immediately, Mr. Winrow's combined statements regarding the circumstances soon after his alleged fall indicate that a Request for Medical Attention form was provided by Defendant Powell and that was sufficient to address his immediate needs. Mr. Winrow's allegations against Defendant Hisaw do not clearly extend to any date beyond August 11, 2013. To the extent that Mr. Winrow's allegations against Defendant Powell extend to August 12, 2013, based on the Grievance addressed to Defendant Powell on that date, Mr. Winrow has failed to establish that Defendant Powell exhibited deliberate indifference to a serious medical need by Mr. Winrow.

The August 12, 2013 Grievance reflects Mr. Winrow expressing a "need to see the doctor" because his "head and knee [were] in pain" and his "back and shoulder hurt bad."

Compl. Exs. at 14.  Mr. Winrow also asked Defendant Powell to "[p]lease call medical" because Mr. Winrow's "shoulder [was] still out of joint."  *Id.*  Mr. Winrow further requested "another ice pack."  *Id.*  As noted above, this Grievance bears no clear indicia that Defendant Powell or anyone else at the PCPSC received it.  *See id.*  Mr. Winrow does not mention this Grievance in his Complaint or elsewhere.  Thus, Mr. Winrow does not clearly allege, much less establish, that Defendant Powell failed to address these requests appropriately.

Even assuming that Defendant Powell received the Grievance, there is no indication that Defendant Powell improperly ignored Mr. Winrow's requests.  Mr. Winrow's other Exhibits reflect that he was evaluated by a nurse the next day and thus do not eliminate the possibility that Defendant Powell contacted the medical unit on Mr. Winrow's behalf.  *See id.* at 11, 13.  Further, there is no indication that Mr. Winrow was denied an ice pack (which is not to suggest that such a denial would inherently constitute an Eighth Amendment violation), and Mr. Winrow's request for "another ice pack" in the Grievance itself indicates that Defendant Powell or someone else at the PCPSC had previously provided an ice pack to Mr. Winrow.  Such facts, with no other evidence to provide context, cannot support a reasonable inference that Defendant Powell recklessly disregarded a substantial risk of serious harm to Mr. Winrow.

Thus, considering the evidence and the inferences drawn from the record in the light most favorable to Mr. Winrow as the nonmoving party, the undersigned finds that Mr. Winrow has failed to establish the subjective component of this claim and has thus failed to show that an Eighth Amendment violation occurred.  *See Farmer*, 511 U.S. at

842; *Mata*, 427 F.3d at 753; *Martinez*, 563 F.3d at 1089-90; *Daniels*, 474 U.S. at 330. The undersigned therefore concludes that Defendants Powell and Hisaw are entitled to qualified immunity in their individual capacities as to this claim, and the undersigned recommends that summary judgment be granted accordingly. *See* Fed. R. Civ. P. 56(a), (c)(1); *Pearson*, 555 U.S. at 232, 236; *Olsen*, 312 F.3d at 1312.

      ii.    Individual-Capacity Claims Against Defendant Solis

In his Complaint, Mr. Winrow alleges that Defendant Solis violated his Eighth Amendment rights because "when [Defendant Solis] learned of the staircase fall[, she] would not bring [Mr. Winrow] to [the] medical unit to exam[ine] [him]." Compl. at 8. Mr. Winrow also alleges that Defendant Solis "ignored the request for help." *Id.* Mr. Winrow does not elaborate on these allegations as to Defendant Solis in his Complaint or its accompanying Affidavit. Thus, the undersigned considers whether Mr. Winrow has supported these allegations through the Exhibits filed with his Complaint, his Response to Defendants' Dispositive Motion, and his Supplemental Brief on the same, and whether the evidence viewed in the light most favorable to Mr. Winrow is sufficient to establish that Defendant Solis violated Mr. Winrow's Eighth Amendment rights.

Defendant Solis states that she is a "certified advanced medication aide," "serving as the medical services supervisor at the [PCPSC]," whose duties include "ensur[ing] that medical staff respond[] to any written inmate request for medical care including an actual visit with the inmate" and "maintaining an inmate appointment list for the next doctor's

visit." Defs.' Disp. Mot. Ex. 6 ("Def. Solis' Decl."), Doc. No. 41-6, at 1-2. Defendant Solis is "also responsible for the maintenance of inmate medical records of PCPSC."[19] *Id.* at 1. Defendant Solis states that she was never "advised by any medical staff or detention staff member that Mr. Winrow's alleged medical condition constituted an emergency that could not wait for a routine examination from [the] facility's doctor." *Id.* at 6. Further, "based on [her] personal observation of Mr. Winrow and his actions/movements," Defendant Solis "did not believe that Mr. Winrow had any serious injuries as he alleged." *Id.* at 5.

The undersigned proceeds to review the relevant evidence chronologically from the point that the first PCPSC medical unit staff member became involved in Mr. Winrow's care after his alleged fall on August 11, 2013, when Mr. Winrow handed his first Request for Medical Attention to Nurse Chalis that evening.[20] Although that Request sought only pain medication for his knee and back, Mr. Winrow asserts that he "showed Nurse Chalis . . . the injuries that [he] received while falling down the staircase" and that Nurse Chalis "said she would schedule [him] to see the doctor." Compl. Aff. at 4 (emphasis omitted). The written response to the Request, however, reflects only that "[i]buprofen [was] given at 2300." *See* Compl. Exs. at 12.

---

[19] Defendant Solis' Declaration does not reflect that she has had any medical training beyond "formal training as a medication aide." *See* Def. Solis' Decl. at 1.

[20] The undersigned does not include the August 12, 2013 Grievance addressed to Defendant Powell among the relevant evidence here because there is no indication on the form or otherwise that anyone from the PCPSC medical unit, or who exercised any control over that unit, received or was aware of that Grievance. *See* Compl. Exs. at 14.

As discussed above, Mr. Winrow also separately submitted a Grievance dated August 11, 2013, on which he stated: "I was coming down the stair case and slipped and fell on the water j[u]g which was on the stair steps at lunch. I hurt my knee and back during the incident and need some pain medication[]s please." *Id.* at 11. The response dated August 13, 2013, indicates that Mr. Winrow was evaluated by Nurse Surdy, who noted that Mr. Winrow reported that he "fell" and recorded Mr. Winrow's subjective symptoms as "has had some tingling pain off and on since as well as soreness." *See id.*; *see also* Def. Solis' Decl. at 3. Nurse Surdy also noted "no swelling" and "no open sores," although it is unclear whether these observations were Nurse Surdy's or Mr. Winrow's. *See* Compl. Exs. at 11. Nurse Surdy documented that 800 milligrams of ibuprofen was provided to Mr. Winrow. *See id.*

Also as discussed above, Nurse Surdy responded that same day to an August 12, 2013 Request for Medical Attention in which Mr. Winrow requested pain medication for his knee and back. *See id.* at 13. In that response, Nurse Surdy noted: "States fell and twisted [right] knee[;] no swelling noted. No open abrasion. States neck a little sore." *Id.* at 13.

On August 13, 2013, the date that Mr. Winrow was first evaluated by Nurse Surdy, Mr. Winrow "sent to [Nurse] Chalis" a Grievance addressed to Defendant Thompson, in which Mr. Winrow stated:

> Ms. Thompson, I[']m respectfully sending you this Grievance appeal because I hurt myself on the staircase on 8-11-13[.]
>
> During lunch I fell over the water jug that was on the staircase dripping water[.] I fell 8 steps to the floor landing on my shoulder and

back, and twisting my knee[.]  My shoulder joint is swelling and I have a [stinging] pain in my neck and arm area[.]  I sent request to staff and medical which gave me Ibupro[f]en, Tylenol, told me to lay[]down and relax but it hurts bad.

Relief Requested:

I'm requesting to be seen by a[] doctor[.]  My neck[,] back and shoulder [are] in nerve sting[]ing pain.  Thank you.

*See* Pl.'s Supplemental Br. Exs. at 8; Defs.' Disp. Mot. Ex. 4 at 11-12.  Nurse Surdy responded to the Grievance on August 16, 2013:

[Inmate] was medical[l]y cleared prior to 8-13-13 complained of falling and hitting knee and back on step from water jug.  No swelling or bruising noted.  None wit[]nessed or reported event.  Only Request at that time was for [ibuprofen] for soreness[.]  Will place on Dr list as needed[.]  Please keep medical advised as needed.

Pl.'s Supplemental Br. Exs. at 8.  There is no clear indication that any Defendant received this Grievance.  *See id.*

In a Grievance dated August 15, 2013, and addressed to Defendant Stell, Mr. Winrow mentions that he "fell over water jug coming down the staircase on Pod A," but he does not mention any injuries or medical care issues, focusing instead on allegedly unsanitary conditions of confinement.[21]  *See* Compl. Exs. at 15-16.

On August 18, 2013, five days after Mr. Winrow last mentioned his alleged injuries and requested medical care, Mr. Winrow submitted a Request for Medical Attention in which he stated: "On 8-11-13 I fell on the staircase during lunch[.]  I[']ve

---

[21] As noted in the section above regarding allegedly unsanitary conditions, there is no indication that Defendant Stell received this Grievance.  *See* Compl. Exs. at 15.

filled out several request[s] for medical attention but can[']t see anyone[.]  Can I have some Tylenol[?]  I[']m in pain."  *See* Pl.'s Supplemental Br. Exs. at 5; Defs.' Disp. Mot. Ex. 4 at 10.  Nurse Chalis responded on the same date: "[T]ylenol given."  Pl.'s Supplemental Br. Exs. at 5.

On a Request for Medical Attention dated August 19, 2013, Mr. Winrow stated: "On 8-11-13 I fell over the water jug on the staircase at lunch[;] I hurt my back, shoulder, knee[.]  I'm being denied to see the Doctor[.]  I[']m in pain and need Tylenol or something please."  Compl. Exs. at 17; *see also* Compl. Aff. at 4.  Mr. Winrow received a response from Defendant Solis dated August 20, 2013, stating, "You can see Dr 8/22/13[.]  No one denied you to see Doctor."  Compl. Exs. at 17 (noting further "he hasn't been here"); *see also* Compl. Aff. at 4.

On a Request for Medical Attention dated August 22, 2013, Mr. Winrow stated that he was "requesting why [his] appointment was canceled . . . and requesting Tylenol[]."  Compl. Exs. at 18.  In a response dated that same date, Nurse Chalis stated, "[T]ylenol [was] given at Medpass."  *See* Compl. Exs. at 18.  Although not reflected in Nurse Chalis' response, Defendant Solis states in her Declaration that the doctor—who generally visited the PCPSC weekly to "evaluate and treat inmates" and to "review nurses' actions" and who was "on 24[-]hour call to address any medical issues that may arise between his visits"— was "absen[t] on the scheduled day."  *See* Def. Solis' Decl. at 4.

On a Request to Staff dated August 23, 2013, and submitted by Mr. Winrow to his "unit officer" during the second shift, Mr. Winrow stated:

> On 8-11-13 I hurt my shoulder and back and knee, during a fall on the staircase, at lunch.
>
> My knee has a knot on the back side of it and my shoulder is popping, in and out of its joint[.] I need to see the Doctor[.]
>
> Will you give me something for the pain 'please'[?]

*See* Pl.'s Supplemental Br. Exs. at 7; Compl. Aff. at 4-5. In a response dated August 24, 2013, during the first shift, Nurse Surdy responded: "Will place on next available Dr list." Pl.'s Supplemental Br. Exs. at 7. Nurse Surdy also noted that 800 milligrams of ibuprofen was provided for pain. *See id.*; *see also* Compl. Aff. at 5.

On a Grievance dated August 24, 2013, and addressed to Defendant Thompson, Mr. Winrow stated:

> Ms. Thompson, I fell over the water jug on the staircase on 8-11-13[;] [Defendants Powell and Hisaw had placed] it there. My shoulder came out of socket and my knee twisted and I now have a knot behind my knee joint. I was examined by Nurse Chalis, and Surdy[.] I put in a medical form[] and appointment was scheduled on 8-22-13 by [Defendant Solis]. I was never taken to it . . . . I[']m in pain d[ue] to my shoulder joint coming out of place, and my nerves in my arm [are] tingling as if my arm is constantly num[b]. I twisted the right knee and now have tend[o]n in a knot the size of a grape.

Compl. Exs. at 19-20. Mr. Winrow then requested that Defendant Thompson schedule Mr. Winrow an appointment with the doctor. *Id.* at 20. In a response also dated August 24, 2013, a staff member—"J. Suneagle," who is not a defendant in this civil action— stated (incongruously, given the date of the Grievance): "I just read your medical request[, and] it says the dr. hasn't been here but [Defendant Solis] dated [and] stated that [on] 8/20/13[.] So you may have already been seen." *See id.* at 19; Compl. at 1-2; *see also* Compl. Aff. at 5. Although it is not reflected in the response, Mr. Winrow asserts

that Ms. Suneagle told him that "she called the director and that [he] would be seen soon." Compl. Aff. at 5. There is no indication that any Defendant received this Grievance. *See* Compl. Exs. at 19.

On a Request for Medical Attention dated August 25, 2013, Mr. Winrow again requested an appointment with the doctor, stating: "I have a problem with my shoulder and knee[;] I fell down the staircase during lunch and dislocated my shoulder and knee." *Id.* at 21. In a response dated August 27, 2013, Defendant Solis stated: "You see DR 8/29/13." *See id.*; *see also* Compl. Aff. at 5. Separately, on a Request for Medical Attention also dated August 25, 2013, Mr. Winrow wrote only, "Requesting Tylenol[]." *See* Pl.'s Supplemental Br. Exs. at 14; Defs.' Disp. Mot. Ex. 4 at 4. The response from Nurse Surdy dated August 26, 2013, states that he was provided 1,000 milligrams of Tylenol. *See* Pl.'s Supplemental Br. Exs. at 14. Similarly, on a Request for Medical Attention dated August 26, 2013, Mr. Winrow wrote, "Requesting Tylenol for my pain," to which Nurse Chalis responded on the same date: "[T]ylenol given." *See id.* at 15; Defs.' Disp. Mot. Ex. 4 at 1.

On a Grievance dated August 26, 2013, and addressed to Defendant Stell, Mr. Winrow stated:

> Mr[.] Sid Stell, on or about 8-11-13, [Defendants Powell and Hisaw] fed Pod A lunch[.] [D]uring lunch the water jug was placed on the staircase where inmates sit to eat[.] [T]he jug was leaking water and I stepped between two inmates to put my tray at the door and fell 8- steps to the floor, slipping and lo[]sing my footing in the water.
>
> Mr. Stell, my shoulder came out of joint and my knee twisted damaging the joint & tendon which is now in a knot behind my knee. My shoulder comes out of joint now and hurt[]s like crazy[.] [M]y nerves in

my arm [are] num[b] constantly. I[']ve put in several medical request[s] but keep being denied medical care . . . .

On 8-19-13, I submitted a Request for Medical Attention[.] On 8.20.13 [Defendant Solis], gave answer stating that I would be seen by Dr. on 8-22-13. I was not taken to medical even after requesting medical attention from the Unit Officer[]s[;] the nurses have given me ice pack[]s but I need medical care for these injuries.

Compl. Exs. at 22-23.[22] In response, dated August 27, 2013, Defendant Solis stated:

"You are on schedule for 8/29/13 to see Doctor. You were placed on waiting list and you

were seen initially by medical when you[] alleged injury. No complaints or any officer

[saw] you fall on that day."[23] *Id.* at 22. Defendant Solis also noted: "At time of intake on

your asses[s]ment you advised you had a history of shoulder pain that you allegedly were

getting treated at [O]DOC." *Id.* There is no indication that any Defendant other than

Defendant Solis received this Grievance. *See id.* at 22; Pl.'s Supplemental Br. Exs. at 9.

On a Request for Medical Attention dated August 27, 2013, at 5:30 PM, Mr.

Winrow requested "pain medication for [his] shoulder and knee" and requested "help" for

a "very painful" "knot on [his] tendon." Compl. Exs. at 24. In a response dated the same

date, Nurse Chalis stated: "[Inmate] has knot on inside of [right] knee[;] stated it feels

---

[22] A substantively similar Grievance that was submitted by Mr. Winrow on August 26, 2013, and addressed to Defendant Stell was responded to on that same date by Ms. Suneagle: "[Defendant Solis] has you scheduled this week to see the dr." *See* Pl.'s Supplemental Br. Exs. at 9-10. There is no indication that Defendant Stell received this Grievance. *See id.*

[23] This statement continues, "You are on list therefor you are . . . ," but the final portion of the statement is only partially visible, appearing to state "not denied medical." *See* Pl.'s Supplemental Br. Exs. at 11-12; *see also* Compl. Exs. at 22; Defs.' Disp. Mot. Exs. at 5, 15.

tingly down his leg. [T]ylenol given[.]" *Id.* On a Grievance also dated August 27, 2013, Mr. Winrow does not discuss any medical issues but instead seeks an "answer to [an August 11, 2013] grievance appeal that Nurse Chalis" submitted either to "the Grievance Officer" or "the Facility Commander." *See id.* at 25. In an undated and seemingly unfinished response, Defendant Solis wrote: "A medical Request was filled out by you 8/11/13 and you were[.]" *See id.*

On August 28, 2013, before his scheduled appointment with the doctor at the PCPSC could take place, Mr. Winrow was returned to Dick Conner Correctional Center ("DCCC"). *See* Defs.' Disp. Mot. Ex. 1, Doc. No. 41-1, at 1, 5; Def. Solis' Decl. at 5. Mr. Winrow asserts that he "was never seen by the [PCPSC]'s medical unit" and that he did not "receive any 'medical attention' for the . . . []neck stinger / nerve problems that came from the staircase fall." Compl. Aff. at 6. He states that during the period after his alleged injury but before his transfer back to DCCC, he was never provided with braces for his neck, arm, or knee. *See id.* Mr. Winrow further asserts that "[t]he medical unit has [a] policy to bring only those inmate[]s who can pay the fifteen – 15 – dollar service charge, as listed on [PCPSC's Request for Medical Attention] form." *Id.* (emphasis and internal quotation marks omitted); *see also, e.g.*, Compl. Exs. at 12 (requiring inmate to acknowledge own liability for certain medical expenses when requesting medical care). Mr. Winrow alleges that "[b]ecause [he] was indigent/poor, he was taken off the medical list and replaced by the inmates who could pay the initial medical appointment fee[]s." Compl. Aff. at 6 (internal quotation marks omitted).

Although Mr. Winrow disputes that the medical care he received was adequate, it is undisputed that Mr. Winrow received the care detailed above at the PCPSC. It is also undisputed that he was not evaluated by a doctor while incarcerated at the PCPSC.

Mr. Winrow states that he received medical care upon his return to DCCC. *See* Compl. Aff. at 6-7. This care is chronicled below to the extent that it provides further insight into Mr. Winrow's alleged medical issues while at the PCPSC.

Upon his August 28, 2013 return to DCCC, Mr. Winrow submitted a Request for Health Services that was received by "DCCC-Medical" the next day:

> I[']m requesting to see the Dr. I have a knot on the back of my knee from falling down a flight of stair[]s in the [PCPSC.] My shoulder was also knocked out of joint. Will you schedule me please[?]

Compl. Exs. at 7; Defs.' Disp. Mot. at 20. Mr. Winrow did not mention any pain or request any medication. *See* Compl. Exs. at 7; Defs.' Disp. Mot. at 20. A DCCC medical staff member responded that day that an appointment with a "[p]rovider" had been scheduled for September 3, 2013. *See* Compl. Exs. at 7; Defs.' Disp. Mot. at 20.

Mr. Winrow also dated a Request to Staff at DCCC August 28, 2013, and addressed it to his case manager there:

> I[']m sending you this request asking if you will call Warden Terry Martin, and have him call the [PCPSC], and have them pay to have my knee and shoulder repaired by [an] outside Dr. I fell down their staircase during lunch and tore the tendon[]s in my knee[;] my shoulder was dislocated also[.] I was seen by medical but did not get to go to the Hospital for corrective surgery[.] . . . . I[']m in constant pain and need medical treatment[]s soon before the tendon can[']t be repaired[;] it's already in a knot the size of a grape.

Compl. Exs. at 1.  In a response from his case manager dated more than a week later, Mr. Winrow was advised to address this medical issue "through the proper channels in medical." *Id.*

A medical record from Mr. Winrow's September 3, 2013 appointment with a physician assistant at DCCC reflects Mr. Winrow's chief complaint as being a "'knot on back of R knee'" with a description of his circumstances as follows:

> Pt states he fell down stairs, caught his R foot between the stairs, and twisted his R knee 30 days ago.  Pt states he was able to ambulate without trouble immediately following fall, but noted a minimal amount of swelling that resolved quickly.  Pt states he uses an Ace bandage for support and takes indomethacin for pain.

Defs.' Disp. Mot. Ex. 5 at 29.[24]  A separate medical record from DCCC reflects that Mr. Winrow had been prescribed indomethacin, a nonsteroidal anti-inflammatory drug,[25] for left shoulder pain in July 2013—before his temporary transfer to the PCPSC.  *See id.* at 27.  At the September 3rd DCCC appointment, the physician assistant confirmed the existence of a "[f]irm, movable nodule" behind Mr. Winrow's right knee and ordered that Mr. Winrow's indomethacin be continued and that he be fitted for a neoprene sleeve for

---

[24] In his Response, Mr. Winrow states that "when [he] was seen by Medical Staff at [DCCC], the swelling was down, but the pain remained, and the defendant's denial of this injury continues to this date." Pl.'s Resp. at 7.  Mr. Winrow then asserts that he "is now being seen by [former] defendant Justin Jones['] medical staff which causes a[] 'conflict of interest' due to the down playing of [Mr. Winrow's] injurie[]s." *Id.* (emphasis omitted).  Mr. Winrow also disputes Defendants' attribution of his knee injury to a preexisting condition.  *See id.* at 10-11, 17.  Nevertheless, Mr. Winrow does not specifically challenge the authenticity of or the accuracy of statements within any medical record filed by Defendants as evidence. *See id.* at 7-8, 10-11, 17.

[25] Fed. Drug Admin., Medication Guide for Non-Steroidal Anti-Inflammatory Drugs 4 (2007), *available at* http://www.fda.gov/downloads/Drugs/DrugSafety/ucm089162.pdft.

his knee. *Id.* at 29. An ultrasound was also ordered to determine whether the nodule was fluid filled and could therefore be treated through methods to reduce its size. *Id.*; *see also id.* at 28 (finding "probable popliteal cyst" during ultrasound performed on Mr. Winrow's right knee ten days later (capitalization altered)).

Mr. Winrow's next medical appointment at DCCC occurred on September 24, 2013, with a DCCC physician.[26] *See id.* at 26-27. Mr. Winrow's chief complaint was "right shoulder and neck pain" with the following description: "He relates this to an injury in August, 2013 when he states he fell. Also complain[]s of vague numbness sensation in the right upper extremity without weakness. Also continues to be concerned about previously diagnosed popliteal cyst in the right posterior knee." *Id.* at 26. In his "Physical Findings," the physician noted as to the shoulder: "normal range of motion and normal right hand grip," and as to the cyst: "slightly mobile without significant pain, no swelling." *Id.* at 27.[27] In his "Assessment/Diagnosis," the physician noted: "Subjective right shoulder pain/discomfort and associated cervical musculature pain. Popliteal small

---

[26] After his August 28, 2013 Request for Health Services, Mr. Winrow's next Request for Health Services is dated September 8, 2013, with Mr. Winrow requesting an "appointment for my knee pain and shoulder, and I[']m having problems with my back & []neck." Compl. Exs. at 8; Defs. Disp. Mot. Ex. 5 at 21. An appointment was scheduled for September 10, 2013, but Mr. Winrow appears to have missed that appointment. *See id.* at 21-22. On September 17, 2013, Mr. Winrow sought to reschedule the missed appointment, stating that his "shoulder and knee hurt[] bad[ly]." *Id.* at 22. An appointment was then scheduled for September 24, 2013. *Id.*

[27] As filed by Defendants, this medical record is redacted, perhaps due to the Court's order restricting the discoverability of Mr. Winrow's medical records to exclude certain mental health treatment records. *See* Defs.' Disp. Mot. Ex. 5 at 27; Order, Doc. No. 35. Mr. Winrow has not challenged the redaction.

cyst uncomplicated, benign at present." *Id.* In his treatment plan, the physician noted that Mr. Winrow was already taking indomethacin and ordered a one-time injection of Kenalog (triamcinolone acetonide, a synthetic corticosteroid)[28] in Mr. Winrow's right deltoid, as well as an x-ray of Mr. Winrow's cervical spine and right shoulder. *See id.* The physician ordered "[n]o further treatment for popliteal cyst" but noted that it should be reevaluated as necessary. *See id.* A report from an x-ray of Mr. Winrow's cervical spine performed at DCCC approximately one week later reflects a diagnostic impression of "moderate plus [degenerative joint disease] C5-6 and C6-7," after findings of "moderate disc space narrowing with anterior and smaller posterior osteophytosis."[29] *Id.* at 30-31. If an x-ray of Mr. Winrow's right shoulder was performed, no record of the result was filed by either party.

During late September 2013, Mr. Winrow also sought to obtain outside specialty care via the DCCC administrative remedy process. *See* Compl. Exs. at 2-3. Mr. Winrow's request was denied because his DCCC medical provider(s) found that his "condition [did] not warrant referral for specialized care." *Id.* at 3; *see also id.* at 4-6.

In his next Request for Health Services, over three weeks later on October 18, 2013, Mr. Winrow sought "another shot for the pain in [his] back and []neck and

---

[28] *Kenalog®-40 Injection (triamcinolone acetonide injectable suspension, USP)*, DailyMed, http://dailymed.nlm.nih.gov/dailymed/fda/fdaDrugXsl.cfm?setid=e25cfc22-29ba-473f-88c4-3c88e9f6863b (last visited Mar. 5, 2015).

[29] Other findings included: "Alignment normal. No fracture or subluxation. No prevertebral soft tissue swelling. No lytic or blastic lesions." Defs.' Disp. Mot. Ex. 5 at 30. Vertebral height was also noted to be well preserved. *Id.*

shoulder areas," stating that his "nerves are numb in those areas and it's very uncomfortable during the day and while sleeping at [night]." *Id.* at 9; Defs.' Disp. Mot. Ex. 5 at 23. Mr. Winrow also reported that his knee was "hurting [him] bad[ly]." Compl. Exs. at 9; Defs.' Disp. Mot. Ex. 5 at 23. In a Request for Health Services dated two days later Mr. Winrow described his circumstances differently:

> On 8-11-13 I fell down a staircase hitting my head on the floor while in the [PCPSC.] I[']m having serious migrain[e] headaches and nerve pain in my []neck[.] Will you please check me-out for Concussion[;] my head is hurting real[l]y bad[.] [I]t's hard to sleep and look at bri[ght] light[]s outside and in my room.

Compl. Exs. at 10; Defs.' Disp. Mot. at 24. In response, Mr. Winrow was scheduled for a nursing appointment a few days later. Compl. Exs. at 10; Defs.' Disp. Mot. at 24. There are no further records as to Mr. Winrow's condition.

Returning now to Mr. Winrow's specific allegations against Defendant Solis as to this claim in his Complaint—i.e., that she "would not bring [Mr. Winrow] to [the] medical unit to exam[ine] [him]" and "ignored the request for help"—the undersigned finds from the evidentiary material presented by the parties that Mr. Winrow has failed to establish the subjective component of this Eighth Amendment claim. Even assuming in Mr. Winrow's favor that Defendant Solis, as the medical services supervisor, was aware of each request that Mr. Winrow submitted to the PCPSC's medical unit, Mr. Winrow's own evidence undermines his contention that requests were "ignored," as well as his suggestion that Defendant Solis intentionally obstructed Mr. Winrow's access to necessary care. Essentially, Mr. Winrow has failed to present sufficient evidence to establish that Defendant Solis' conduct went beyond negligence to knowingly and

recklessly disregarding a substantial risk of serious harm to Mr. Winrow, as required for an Eighth Amendment violation. *See Farmer*, 511 U.S. at 835; *Estelle*, 429 U.S. at 105-06.

When Mr. Winrow first requested pain medication, the request was honored by a nurse within less than two hours—possibly immediately. *See* Compl. Exs. at 12. When Mr. Winrow first requested, in writing, an appointment with the doctor, a nurse responded that Mr. Winrow would be "place[d] on Dr list as needed" and instructed Mr. Winrow to "keep medical advised as needed." *See* Pl.'s Supplemental Br. Exs. at 8. Five days passed between Mr. Winrow's written request for a doctor's appointment and his next medical request, which was only for Tylenol and was fulfilled by a nurse that day. *See id.* at 5. When Mr. Winrow alleged the next day that he was "being denied to see the Doctor," Defendant Solis informed him that the doctor had not been there and that Mr. Winrow could see the doctor within a few days. Compl. Exs. at 17; *see also* Compl. Aff. at 4. In the intervening days, Mr. Winrow submitted no requests for medical care. When the appointment did not occur as scheduled, Mr. Winrow asked to know why and requested Tylenol—without describing his physical condition—and the requested medication was provided by a nurse that day. *See* Compl. Exs. at 18.

The next evening, Mr. Winrow described specific physical symptoms—a knot on the back of his knee and his shoulder popping in and out of joint—in addition to pain, and the following day, a nurse provided requested pain medication and noted that Mr. Winrow would be "place[d] on the next available Dr list." *See* Pl.'s Supplemental Br. Exs. at 7. Defendant Solis and another staff member each confirmed for Mr. Winrow that

his appointment with the doctor was within less than one week of the nurse's statement. *See* Compl. Exs. at 21, 22; Pl.'s Supplemental Br. Exs. at 9. In his subsequent and only remaining days at the PCPSC, Mr. Winrow continued to request Tylenol or "pain medication," which was provided each time. *See* Pl.'s Supplemental Br. Exs. at 14, 15; Compl. Exs. at 24. Upon requesting "help" for the "very painful" "knot on [his] tendon," a nurse at least conferred with Mr. Winrow regarding his symptoms and provided Tylenol. *See* Compl. Exs. at 24. The next day, Mr. Winrow was returned to DCCC. *See* Compl. Exs. at 7; Defs.' Disp. Mot. Ex. 1 at 1, 5; Def. Solis' Decl. at 5.

In sum, Mr. Winrow was repeatedly provided with pain medication upon request. Although Mr. Winrow continued to report that he was experiencing pain, he often specifically requested only Tylenol, which was provided. At times, Mr. Winrow did not request any medical care for several days. Ultimately, Mr. Winrow's requests resulted in interactions with PCPSC nurses on at least eight occasions during the approximately 17-day period after his alleged fall. The evidence of these interactions, as detailed above, does not support a reasonable inference that Mr. Winrow's requests were ever improperly denied.

As noted, it is undisputed that Mr. Winrow received some medical care while at the PCPSC. There is no evidence that Defendant Solis directly provided care to Mr. Winrow; instead Defendant Solis acted as a gatekeeper to medical care—e.g., as the supervisor responsible for facilitating access to the doctor, nurses, and medication. Mr. Winrow has presented no evidence that Defendant Solis refused to fulfill that role. *See Self*, 439 F.3d at 1232. Mr. Winrow does not specifically dispute the fact that Defendant

Solis placed Mr. Winrow on a list to see the doctor; nor does he dispute that this placement was done in accordance with the priority specified by a nurse ("next available Dr list," Pl.'s Supplemental Br. Exs. at 7).[30]   The available evidence fails to support a reasonable inference that Defendant Solis knew that a doctor's care was more urgently needed and that she recklessly disregarded such a need.  Mr. Winrow's suggestion that he should have received earlier attention from a doctor or other care, including braces for his allegedly injured joints, appears to present a mere disagreement between Mr. Winrow and the PCPSC medical staff regarding the proper course of diagnosis and treatment.  Such a disagreement alone is insufficient to constitute an Eighth Amendment violation, particularly where the objective evidence of Mr. Winrow's condition generally indicates that there was no acute problem.[31]   *See Estelle*, 429 U.S. at 106-07; *Self*, 439 F.3d at

---

[30] Although Mr. Winrow alleges that he was "taken off the medical list" due to an inability to pay a $15 fee, he presents no evidence beyond his sworn statement to substantiate the allegation, which appears to be based on mere speculation and would only be inferentially connected to Defendant Solis as the medical services supervisor. *See* Compl. Aff. at 6.  To avoid summary judgment, a nonmovant cannot rely on mere speculation.  *Self*, 439 F.3d at 1230.  Thus, to the extent that this allegation involves Defendant Solis, the undersigned accords it no probative weight in this summary judgment analysis.  *See id.*

[31] Despite his broad statements in requests for medical care, Mr. Winrow was documented as generally reporting minor or seemingly less significant symptoms during interactions with PCPSC nurses.  Mr. Winrow initially reported that he "hurt [his] knee and back" and requested only "pain medication."  *See* Compl. Exs. at 11; *see also id.* at 13.  Nurse Surdy noted that Mr. Winrow described his symptoms to her as "tingling pain off and on" and "soreness."  *See id.* at 11; *see also id.* at 13.  Nurse Surdy noted "no swelling" and "no open sores."  *See id.* at 11; *see also id.* at 13.  She determined that ibuprofen was sufficient to treat Mr. Winrow's symptoms.  *See id.* at 11.  Mr. Winrow later reported a "very painful" "knot on his tendon."  *See id.* at 24.  Nurse Chalis noted

1234-35; *Perkins v. Kan. Dep't of Corr.*, 165 F.3d 803, 811 (10th Cir. 1999); *Ramos*, 639 F.2d at 575.

Even if the available evidence did support a reasonable inference that Defendant Solis improperly delayed medical care for Mr. Winrow at the PCPSC, Mr. Winrow presents no evidence that would distinguish Defendant Solis' actions from mere negligence, which would be insufficient to establish an Eighth Amendment violation. *Self*, 439 F.3d at 1233-36; *Perkins*, 165 F.3d at 811; *Ramos*, 639 F.2d at 575. The available evidence is simply insufficient to establish that Defendant Solis—either directly or indirectly as a supervisor—intentionally delayed Mr. Winrow's access to a doctor or other care with the knowledge that such a delay would pose a substantial risk of serious harm to Mr. Winrow. *See Self*, 439 F.3d at 1230, 1235-36; *Mata*, 427 F.3d at 760-61; *Sealock*, 218 F.3d at 1211.

Thus, considering the evidence and the inferences drawn from the record in the light most favorable to Mr. Winrow as the nonmoving party, the undersigned finds that Mr. Winrow has failed to establish the subjective component of this claim against Defendant Solis and has thus failed to show that Defendant Solis violated his Eighth Amendment rights.[32] *See Farmer*, 511 U.S. at 842; *Daniels*, 474 U.S. at 330; *Martinez*,

_____

that Mr. Winrow described his symptoms to her as "tingly down his leg." *Id.* Nurse Chalis determined that Tylenol was sufficient to treat the symptom. *See id.*

[32] The available evidence also raises a substantial question regarding whether Mr. Winrow has established the objective component of his Eighth Amendment medical care-related claims—i.e., whether Mr. Winrow has established that his medical condition was sufficiently serious or that he suffered substantial harm, such as a permanent disability or

563 F.3d at 1089-90; *Mata*, 427 F.3d at 753. The undersigned therefore concludes that Defendant Solis is entitled to qualified immunity in her individual capacity as to this claim, and the undersigned recommends that summary judgment be granted accordingly. *See* Fed. R. Civ. P. 56(a), (c)(1); *Pearson*, 555 U.S. at 232, 236; *Olsen*, 312 F.3d at 1312.

      iii.    Individual-Capacity Claims Against Defendants Stell and Thompson

Mr. Winrow alleges that Defendant Stell violated his Eighth Amendment rights by "den[ying] [Mr. Winrow] access to medical after the incident was reported, and would not . . . take [Mr. Winrow] to medical." Compl. at 4. Mr. Winrow alleges that Defendant Thompson violated his Eighth Amendment rights "by allowing her employee[]s to injur[e] [Mr. Winrow], then deny [Mr. Winrow] access to medical unit" and "by allowing her medical supervisor, [Defendant Solis], to deny [Mr. Winrow] access to medical, doctor." Compl. at 5. Although to some extent unclear, these medical-care-related claims are most reasonably understood as relating to Mr. Winrow's alleged fall-related injuries. *See id.* at 4, 5; *see also* Compl. Aff. at 5.

In their Dispositive Motion, Defendants Stell and Thompson disavow any participation in decisions regarding Mr. Winrow's medical care. *See* Defs.' Disp. Mot. at 15, 23-24; Def. Stell's Decl., Doc. No. 41-16, at 1, 5-6; Def. Thompson's Decl., Doc. No. 41-15, at 3, 4-5. In support of the Motion, Defendants Stell states, "Although Mr. Winrow's PCPSC inmate's medical file reflects at least one request/grievance addressed

---

substantial pain, while awaiting treatment. *See Al-Turki*, 762 F.3d at 1193; *Mata*, 427 F.3d at 753; *Sealock*, 218 F.3d at 1210.

to me, I did not prepare or participate in any response." Def. Stell's Decl. at 6. Similarly, Defendant Thompson states, "Although Mr. Winrow's PCPSC inmate's medical file reflects at least one request/grievance addressed to me, I did not prepare any response." Def. Thompson's Decl. at 4. Defendants Stell and Thompson do not directly state, however, whether they were aware of Mr. Winrow's requests for medical care.

In his Response, Mr. Winrow asserts that Defendants Stell and Thompson had "'management duties'" as directors at the PCPSC and "failed to train their staff in the basic care of managing a jail, prison system." Pl.'s Resp. at 12, 13. However, Mr. Winrow does not specifically respond to Defendants Stell and Thompson's assertions in their Dispositive Motion or respective Declarations. *See id.* at 12-15; *see also* Pl.'s Supplemental Br. at 1-6; LCvR 56.1(c).

Mr. Winrow's evidence fails to establish that he ever had any direct interaction with either Defendant Stell or Defendant Thompson regarding his medical care. Further, although Mr. Winrow addressed two August 26, 2013 Grievances to Defendant Stell, there is no evidence in the record that Defendant Stell received those Grievances or was aware of the specific allegations therein at the relevant time. *See* Compl. Exs. at 22-23; Pl.'s Supplemental Br. at 9-10. Similarly, Mr. Winrow addressed an August 13, 2013 Grievance and an August 24, 2013 Grievance to Defendant Thompson, but there is no evidence that Defendant Thompson received those Grievances or was aware of the specific allegations therein at the relevant time. *See* Pl.'s Supplemental Br. Exs. at 8; Compl. Exs. at 19-20. Further, there is no evidence that Defendants Stell or Thompson made any direct decisions regarding Mr. Winrow's medical care, which—as detailed

above—was overseen by Defendant Solis and others almost immediately after Mr. Winrow's fall on August 11, 2013. There is simply no evidence that Defendant Stell or Defendant Thompson directly participated in any alleged violation of Mr. Winrow's Eighth Amendment rights as to this claim.

There is also no evidence that Defendant Stell or Defendant Thompson indirectly participated as a supervisor in any decision regarding Mr. Winrow's medical care—either by directing the actions of a subordinate employee or by promulgating, creating, implementing, or having responsibility for the continuation of a specific policy that resulted in a violation.[33] *See Iqbal*, 556 U.S. at 676-77; *Schneider*, 717 F.3d at 767-68; *Pahls*, 718 F.3d at 1225, 1226; *Dodds*, 614 F.3d at 1194, 1199. Defendants Stell and Thompson's general status as supervisors, alone, is insufficient for liability under § 1983. *See Dodds*, 614 F.3d at 1195.

The sparse and conclusory factual allegations in Mr. Winrow's Complaint are unsubstantiated as to these claims against Defendants Stell and Thompson and, thus, insufficient to defeat a motion for summary judgment. *See Self*, 439 F.3d at 1230. Without evidence of these Defendants' direct or indirect participation in the alleged violation of Mr. Winrow's Eighth Amendment rights, Mr. Winrow cannot establish that either Defendant Stell or Defendant Thompson acted knowingly and recklessly in disregard of a substantial risk of serious harm to Mr. Winrow.

---

[33] As discussed below, Mr. Winrow mentions the PCPSC's copayment policy but does not connect that policy to a particular Defendant. *See* Compl. Aff. at 6.

Because Mr. Winrow has failed to establish the subjective component of this claim against Defendants Stell and Thompson, he has thus failed to show that these Defendants violated his Eighth Amendment rights. *See Farmer*, 511 U.S. at 842; *Daniels*, 474 U.S. at 330; *Martinez*, 563 F.3d at 1089-90; *Mata*, 427 F.3d at 753. The undersigned therefore concludes that Defendants Stell and Thompson are entitled to qualified immunity in their individual capacities as to these claims, and the undersigned recommends that summary judgment be granted accordingly. *See* Fed. R. Civ. P. 56(a), (c)(1); *Pearson*, 555 U.S. at 232, 236; *Olsen*, 312 F.3d at 1312.

    iv.    Official-Capacity Claims Against Defendants

In their Dispositive Motion, Defendants contend that they are entitled to summary judgment as to any official-capacity claims because Mr. Winrow "does not allege an improper policy or custom" of the PCPSC and, thus, cannot establish any official-capacity claim under § 1983. *See* Defs.' Disp. Mot. at 32. Mr. Winrow does, however, suggest in his Complaint's accompanying Affidavit that a policy at the PCPSC caused a violation of his Eighth Amendment rights: "[t]he medical unit has [a] policy to bring only those inmate[]s who can pay the fifteen – 15 – dollar service charge, as listed on [PCPSC's Request for Medical Attention] form." *See* Compl. Aff. at 6 (emphasis and internal quotation marks omitted). As noted, Mr. Winrow alleges that "[b]ecause [he] was indigent/poor, he was taken off the medical list and replaced by the inmates who could pay the initial medical appointment fee[]s." *Id.* (internal quotation marks omitted). Mr. Winrow does not attribute the alleged policy or any alleged action under the policy to a particular Defendant. *See id.* In responding to Defendants' Dispositive Motion, Mr.

Winrow does not address Defendants' contention that he cannot establish any official-capacity claim. Nor does Mr. Winrow further mention the alleged policy. *See* Pl.'s Resp. at 1-17; Pl.'s Supplemental Br. at 1-7.

Liberally construed, this claim is an official-capacity claim, which, regardless of the particular Defendant against which the claim is asserted, is a claim against Pottawatomie County—thereby implicating municipal liability and requiring Mr. Winrow to first establish the existence of the alleged policy. *See Graham*, 473 U.S. at 165-66; *Schneider*, 717 F.3d at 769-70. Mr. Winrow points only to the PCPSC's Request for Medical Attention form, *see* Compl. Aff. at 6, which advises inmates that they "will be charged $15.00 for each doctor[']s appointment," among other fees for medical services, *see, e.g.*, Compl. Exs. at 12 (capitalization altered). The form reflects no indication that payment or establishment of the ability to pay is required in advance of medical services.[34] *See* Compl. Exs. at 12. Mr. Winrow's policy-related allegations—that a policy exists to provide services only to inmates who can afford the applicable fees and that, in accordance with the policy, "he was taken off the medical list" because he was unable to pay the fee, *see* Compl. Aff. at 6—are wholly unsubstantiated and, thus, insufficient to defeat a motion for summary judgment. *See Self*, 439 F.3d at 1230.

Because Mr. Winrow has not supported the above claim based on an alleged official policy and has failed to identify and support any other claim based on a specific

---

[34] Although the PCPSC appears to maintain a written policy regarding copayment procedures, neither party filed a copy of that policy. *See* Defs.' Disp. Mot. Ex. 10 at 21 (cross-referencing "Policy & Procedure No. 11-9-8 for Co-Payment Procedures").

official policy or custom of Pottawatomie County, the undersigned finds that Defendants are entitled to summary judgment as to any official-capacity claims under § 1983.  *See Graham*, 473 U.S. at 165-66; *Schneider*, 717 F.3d at 769-70; *Self*, 439 F.3d at 1230.

   b.   Medical Care for Rashes

In his Complaint, Mr. Winrow alleges that Defendant Solis violated his Eighth Amendment rights by denying him medical care for "inflamed skin rashes."  *See* Compl. at 8; *see also id.* at 2.  Mr. Winrow does not elaborate on the alleged denial.  *See id.* at 8. Mr. Winrow does mention "rashes on his thighs and buttocks" in the August 15, 2013 Grievance addressed to Defendant Stell, but Mr. Winrow mentions no requests for or attempts to request medical care in this regard.[35]  Compl. Exs. at 15-16.  Mr. Winrow presents no evidence that he ever reported any rashes to Defendant Solis or the PCPSC's medical unit.

In her Declaration in support of Defendants' Dispositive Motion, Defendant Solis states that she is "not aware of Mr. Winrow ever complaining of or seeking medical care for any type of rash while he was incarcerated in the PCPSC."  Def. Solis' Decl. at 6. Mr. Winrow does not challenge this assertion in his Response or Supplemental Brief.  *See* Pl.'s Resp. at 1-17; Pl.'s Supplemental Br. at 1-7.

Because Mr. Winrow has presented no evidence that he ever sought medical care for the alleged rashes while at the PCPSC, Mr. Winrow has failed to establish the

---

[35] As noted, there is no evidence that Defendant Stell or any member of the PCPSC's medical unit's staff received this Grievance.  *See* Compl. Exs. at 15-16.

subjective component of this Eighth Amendment claim—i.e., that Defendant Solis directly or indirectly, knowingly and recklessly disregarded a substantial risk of serious harm to Mr. Winrow. *See Farmer*, 511 U.S. at 842; *Daniels*, 474 U.S. at 330; *Martinez*, 563 F.3d at 1089-90; *Mata*, 427 F.3d at 753. The undersigned therefore concludes that Defendant Solis is entitled to qualified immunity in her individual capacity as to this claim, and the undersigned recommends that summary judgment be granted accordingly. *See* Fed. R. Civ. P. 56(a), (c)(1); *Pearson*, 555 U.S. at 232, 236; *Olsen*, 312 F.3d at 1312.

### D. *Whether the Court Should Exercise Supplemental Jurisdiction over Mr. Winrow's State-Law Claims*

At this point, the undersigned has concluded that Mr. Winrow has failed to state or support a claim under 42 U.S.C. § 1983 against Defendants. Mr. Winrow asserts no other claims based on federal law.[36] Because Mr. Winrow also nominally asserts state-law claims against Defendants Stell and Thompson in his Complaint, *see* Compl. at 4, 5, the undersigned now briefly addresses the Court's jurisdiction over such claims. Parties on both sides of this lawsuit appear to be citizens of Oklahoma. *See id.* at 1. Because Mr.

---

[36] In connection with Eighth Amendment claims against Defendants Stell and Thompson, Mr. Winrow also makes the conclusory assertion that these Defendants violated "Federal . . . laws of 2012 [and] 2013." *See* Compl. at 4, 5. The facts alleged by Mr. Winrow in support of these claims do not appear to implicate any federal rights other than those protected by the Eighth Amendment, and therefore the undersigned confines consideration accordingly. Further, in connection with Eighth Amendment claims against Defendants Powell and Hisaw, Mr. Winrow makes the conclusory assertion that these Defendants "denied [Mr. Winrow] medical care after injury in violation of the 1st [and] 8th Amendments." *See* Compl. at 6, 7. The facts alleged by Mr. Winrow in support of these claims again appear to implicate only the Eighth Amendment, and therefore the undersigned confines consideration to that basis of liability.

Winrow's state-law claims do not implicate a federal question within the meaning of 28 U.S.C. § 1331 or a diversity of citizenship within the meaning of 28 U.S.C. § 1332, this federal court does not have original jurisdiction over such claims. Therefore, if the Court adopts the undersigned's recommendations, disposing of Mr. Winrow's § 1983 claims in their entirety, any supplemental jurisdiction the Court may exercise over his state-law claims would be discretionary. *See* 28 U.S.C. § 1367(c)(3). The undersigned recommends that the Court decline to exercise such jurisdiction.[37]

## RECOMMENDATION

For the foregoing reasons, the undersigned recommends that Defendants' Dispositive Motion (Doc. No. 41) be granted to the extent that Defendants seek summary judgment on any individual-capacity or official-capacity claims under § 1983 for violations of Mr. Winrow's rights under the Eighth Amendment's Cruel and Unusual Punishment Clause. This recommendation extends to Mr. Winrow's claims regarding allegedly unsanitary conditions at the PCPSC, which the undersigned has construed as claims under the Eighth Amendment's Cruel and Unusual Punishment Clause. The

---

[37] In concluding his Supplemental Brief, Mr. Winrow states, "The witnesses to Plaintiff's fall off the staircase & the Administrative Grievance appeal order granting relief, [are] material evidence in favor of granting Plaintiff Summary Judgment." Pl.'s Supplemental Br. at 5; *see also id.* at 6 (requesting that the Court deny Defendants' Dispositive Motion "or in the alternative" grant judgment to Mr. Winrow based on "the relief granted within Plaintiff's grievance appeals"). To the extent that Mr. Winrow seeks summary judgment in his favor, such relief is improperly sought through a supplemental brief. *See* LCvR 7.1(c); *see also In re Bank of Am. Wage & Hour Emp't Practices Litig.*, 275 F.R.D. 534, 537 (D. Kan. 2011). Regardless, the undersigned's recommendations, if adopted, would preclude summary judgment for Mr. Winrow even if he had so moved.

undersigned further recommends that Mr. Winrow's remaining claims against Defendants under § 1983 for violations of Mr. Winrow's Fourteenth Amendment rights be dismissed without prejudice, in accordance with the Court's screening authority, for failure to state a claim upon which relief may be granted. Finally, the undersigned recommends that the Court dismiss any state-law claims asserted by Mr. Winrow because the Court should decline to exercise supplemental jurisdiction over such claims.

NOTICE OF RIGHT TO OBJECT

The parties are advised of the right to file an objection to this Report and Recommendation with the Clerk of this Court by March 23, 2015, in accordance with 28 U.S.C. § 636 and Federal Rule of Civil Procedure 72. The parties are further advised that failure to timely object to this Report and Recommendation waives the right to appellate review of both factual and legal issues contained herein. *See Moore v. United States*, 950 F.2d 656, 659 (10th Cir. 1991).

This Report and Recommendation terminates the referral in the present case.

ENTERED this 5th day of March, 2015.

CHARLES B. GOODWIN
UNITED STATES MAGISTRATE JUDGE